[No. 28156. Department Two. June 3, 1941.]

JOHANNA MAITLEN, *Appellant*, v. JOHN B. HAZEN *et al.,*
*Respondents.*[1]

[1]Reported in 113 P. (2d) 1008.

*G. E. Lovell* and *Norman Ericson,* for appellant.

*Robertson & Smith,* for respondents.

JEFFERS, J.—This action was instituted by Johanna Maitlen against John B. Hazen and C. P. Jaeger, a copartnership doing business under the name of Hazen & Jaeger, and Harry W. Rymond, an employee of the copartnership, to recover from defendants the sum of one thousand, five hundred and fifty dollars in cash, which plaintiff alleged was deposited with defendants for safe keeping. Plaintiff further alleged that defendants turned this money over to her son, Gerald Maitlen, while plaintiff was under commitment to the state hospital for the insane at Medical Lake, and while she was suffering from senile dementia and arteriosclerosis, and not qualified either to manage or understand her own affairs.

Defendants denied generally the allegations of the complaint, and alleged affirmatively that plaintiff left with them a certain sealed envelope, the contents of which were not known to defendants, and that thereafter, on February 28, 1938, defendant John B. Hazen, acting in good faith and without any knowledge of any incapacity upon the part of plaintiff, delivered the envelope to Gerald Maitlen, upon the written order of plaintiff, which order was as follows:

"Mr. Hazen—
"This will introduce my son, Gerald Maitlen.
"Would you please let him have the envelope which I left in your care? He is going to take care of my affairs and belongings until I return to Spokane.
"Very truly yours,
"Mrs. Johanna Maitlen."

Defendants further alleged that John B. Hazen asked for and received from Gerald Maitlen, at the time the envelope was turned over to him, the following receipt:

"2/28, 1938
"Received from J. B. Hazen envelope containing effects of Mrs. Johanna Maitlen.
"Gerald Maitlen"

The cause came on for hearing before the court on March 13, 1940, and after the trial was completed and briefs had been submitted, the court made and filed a memorandum opinion, and thereafter, on May 25, 1940, made and entered findings of fact, conclusions of law and judgment in favor of defendants. By the judgment, the court dismissed plaintiff's action, with prejudice. Plaintiff has appealed from the judgment entered.

Appellant claims the court erred in entering judgment for defendants; in entering finding of fact No. 4, which is to the effect that, at the time the order was

given by appellant to her son, appellant was lucid and mentally competent, and understood the nature and consequence of her acts; in entering finding of fact No. 7, which is to the effect that defendants, being gratuitous bailees, were not guilty of negligence in delivering appellant's property to her son, Gerald, upon her written order; and in entering finding of fact No. 3, which is to the effect that, on February 28, 1938, defendant John B. Hazen, acting in good faith and without any knowledge of any incapacity upon the part of appellant, and without any knowledge that appellant had been committed to Medical Lake, upon the written order of appellant, delivered the envelope to her son.

Since the entry of judgment in this case, Johanna Maitlen has died, and there is a motion before this court to substitute as appellant Charles Hafer, who has been appointed administrator of appellant's estate. Respondents have moved to dismiss the appeal, upon the ground that the action abated upon the death of appellant, but frankly state in their brief that they are not urging this motion. The motion of appellant to substitute Charles Hafer, administrator, as appellant, is granted.

The facts in this case are not in dispute, except as to the question of whether or not respondents knew that appellant had been committed to Medical Lake and was an inmate of that institution at the time the order was given to her son. The facts may be stated as follows:

Johanna Maitlen had lived in Spokane for some years, and had been married and divorced. She left surviving her one son, Gerald Maitlen. Mrs. Maitlen had apparently had some training as a nurse, and followed this profession until about the time of her commitment to Medical Lake, on February 4, 1938. Prior to her commitment, appellant had been on relief for

some time, although it appears that she had saved and kept from the knowledge of the authorities the sum of twenty-one hundred dollars. This money Mrs. Maitlen, sometime in the summer or fall of 1937, placed in an envelope and left with Mr. Harry W. Rymond, an employee of Hazen & Jaeger. Both Mr. Rymond and Mr. Hazen testified that they did not know Mrs. Maitlen at that time. At the time the envelope was left with Mr. Rymond, appellant stated to him that, on account of family difficulties, she wanted to leave with Hazen & Jaeger, who conduct a funeral home in Spokane, some directions for her funeral, in the event she passed on.

It is admitted that none of respondents knew the contents of the envelope, which was sealed in the presence of appellant and Mr. Rymond. Appellant was required to write her name in two places across the seal. The envelope was placed in Mr. Hazen's safety deposit box. It does not appear that any special instructions were given by appellant to Mr. Rymond relative to the delivery of the envelope.

At the time of her commitment to the hospital, appellant had suffered quite serious injuries from a fall, as the result of which she had one arm in a cast, and was quite badly bruised about the body and face.

On February 25, 1938, Gerald Maitlen and his father visited appellant at the hospital, and upon this occasion appellant informed them that she had left with respondents an envelope containing her money. It appears from the testimony of Gerald Maitlen that his mother first wanted her former husband (Gerald's father) to get this envelope, and upon his refusal to have anything to do with it, appellant then asked her son to get it and pay some of her bills. Gerald agreed to get the money and place it in a joint account, in a bank in Ione, Washington, where he lived. During

this conversation, appellant informed her son that the money had been left with Mr. Rymond.

Gerald thereupon went to Hazen & Jaeger's funeral parlors, and inquired for Mr. Rymond, and was told by Mr. Hazen, whom he met at that time, that Mr. Rymond was in the east, and would not be back for several days, suggesting that he see him upon his return. Gerald then went back to the hospital and informed his mother that he could not get the envelope without an order, and on February 28, 1938, he secured from his mother the order hereinbefore mentioned, which he presented to Mr. Hazen, who, after checking the signature on the order with the two signatures on the envelope, delivered the envelope to Gerald, taking the receipt hereinbefore set out.

The following is a part of the testimony of Gerald Maitlen as to his mother's mental condition at the time she gave him the order:

"Q. At that time what was your mother's condition mentally? Did she know you? A. Yes, she did. Q. And she was able to remember that she had left this money and envelope at Hazen & Jaeger's? A. Yes. Q. And able to remember the amount of it? A. She didn't state the exact amount, no. She said it was an envelope containing a certain amount of money but she didn't state the amount. Q. Was your mother able to recall past events that had happened before she was sent to the hospital? A. Yes. She remembered where she was staying at the time she had been taken from her hotel and taken out there, and she remembered the deputy sheriff that had took care of the case. Q. She remembered his name? A. Yes, sir. Q. So that you would say she was pretty clear mentally? Is that right? A. Well, she seemed to be at that time."

Appellant was called on rebuttal as a witness in her own behalf, and testified as follows:

"Q. (By Mr. Lovell) When were you sent to the insane asylum? (Objection made and question re-

stated) Q. You went there in February, did you? A. Yes, the 5th of February. . . . My son and his wife and my ex-husband come out, and I had a talk with him and I told him— . . . Q. What did you say to the boy? A. I asked him to take care of my trunk and belongings, and I said, 'I have some bills to be paid and I haven't got no money. I am stuck here and I don't know what for. You take care of my things.' . . . Q. Then tell the conversation you had with your boy. A. Well, so I told my son, 'I have some money at Hazen-Jaeger. Would you please go and get it and pay my bills.' I says, 'I am stuck here.' And he went down the next day and he come back and he said, 'I have been out to Hazen-Jaeger and they wouldn't let me have it without your signature.' And he wrote a note and he said Hazen told him I had to sign it before he could get the money. And I did sign it. Read it and signed it. . . . Q. What was the conversation you had with the boy? What was he to do? A. Pay the bills. Q. How was he to pay the bills? A. Get the money and pay the bills. I had some bills to pay. I couldn't go out. You get in there and you can't go around town paying bills. You can't go and do nothing. You got to have somebody do it for you, and I thought he was the closest one that could do it."

On cross-examination, appellant testified in part as follows:

"Q. Did they ask you if you were on relief? A. Yes. Q. And you told them you had been on relief? A. Yes; I just got that check. Q. How long had you been on relief? A. Well, I don't remember. Q. Several years? A. Oh, no. I got money and I got a chance to go out— Q. If you had this money at Hazen & Jaeger's why did you go on relief? A. Just because I want to make a trip back home to Norway where I came from. . . . Q. You were saving this money to go back home on a trip? A. Yes. Q. Did you ever keep this money in any bank in Spokane? A. At the time the bank broke— Q. This money I am talking about? A. No. Q. Why didn't you put it in a bank account in the usual way? A. Why

should I? I had to use it or I wouldn't have a chance to go home. Q. Why couldn't you have used it if it was in the bank? A. Well, I could, but times was hard. I put some money in the bank and I lost that. Q. But that was a long time ago? A. That was the bank that was broke. . . . Q. As a matter of fact, you left it with Hazen-Jaeger so that the relief authorities couldn't find out you had any sum of money; isn't that correct? A. I don't think so. Q. You don't think so? A. No. If they asked me I would have told them, but they didn't ask me. Q. When you applied for relief didn't they ask you if you had any money or property? A. Yes. They asked me if I had property. Q. Didn't they make you sign a statement that you were destitute, had no money, or anything? A. I didn't have no property. . . . Q. So you told Gerald that this money was out at Hazen & Jaeger's? A. Yes, I did. Q. And you say you wanted him to get it and pay up some of your bills? A. Yes. Q. And take care of the rest of it for you; is that correct? A. That is correct. Q. And you signed this statement that he was to go and get it; is that right? A. I did. Q. You wanted him to go and get it and take care of it for you? A. I did. Q. You understood what you were doing. You wanted him to do it? A. Oh, yes. Q. You thought he would take care of your affairs for you all right? Is that correct? A. Yes.

"By the Court: Q. At the time you gave the order how much money was in the envelope. A. The same amount. Q. What was that amount? A. $2100."

After receiving the money, Gerald deposited it in the Ione bank, and almost immediately began to draw on the account for his own use. With part of the money he bought an automobile, for which he paid seven hundred fifty dollars. When Mrs. Maitlen was paroled from the hospital in June, 1939, she and a Miss Rice went to Ione and made demand on Gerald for this money, and at that time Gerald turned over $452, which was all that was left of the twenty-one

hundred dollars. Gerald at that time also gave his mother a note for six hundred fifty dollars, upon which he has made payments amounting to one hundred ten dollars, and he also turned the automobile over to Mr. Ericson, appellant's attorney.

Mr. Rymond testified that he did not know that the envelope had been turned over to Gerald, until the fall of 1938, at which time Mr. Scott, an attorney, contacted him and informed him that he was investigating the matter of having a guardian appointed for appellant. Mr. Rymond informed Mr. Scott that they had an envelope which they would be glad to turn over to him when a guardian was appointed. Mr. Rymond then talked to Mr. Hazen, and learned that Mr. Hazen had delivered the envelope to Gerald, upon the written order of appellant. Both Mr. Hazen and Mr. Rymond testified that, until they met Mr. Scott, they had no knowledge of Mrs. Maitlen's commitment to Medical Lake, or that she was in any way mentally deficient.

This brings up the only real conflict in the testimony. Gerald testified that, in February, 1938, Mr. Hazen told him that he (Hazen) had read of his mother's commitment, in some little paper published by the hospital. Mr. Hazen denied making any such statement, and stated that he knew nothing about any such paper. The trial court resolved this conflict in favor of respondents.

Dr. John C. Boyle, assistant superintendent of the Medical Lake hospital, who had been connected with the institution since 1913, testified to appellant's mental condition. His testimony was to the effect that he had known appellant practically from the time of her admission to the hospital on February 5, 1938; that she was directly under his charge for about seven months, beginning on March 18, 1938, when she was

transferred from the psychiatric ward to ward A, or the hospital ward, of which he had charge. The doctor further testified that he saw appellant on March 1, 1938, at which time, under a rule of the hospital, appellant was brought before a conference of the doctors. At such conferences the doctors had before them the record of the patients as made up to that time. The doctor stated that appellant at that time was inclined to be emotional, and entertained a peculiar delusion in regard to the burning of a foetus; that later she seemed to overcome this delusion and realized it was not true; that she readily recognized her surroundings, where she was and what she was doing, the persons whom she knew; that her memory was keen and good, except as to the delusions, which in no way pertained to her financial affairs. The doctor further testified that on March 1st, which was the first time he recalled seeing appellant, in his opinion her mental condition was such that she could appreciate and understand the import of a document such as the order given her son on February 28th. It further appears that appellant did well the work assigned to her in the hospital ward, and was able to carry out orders the same as any nurse would. Appellant was sixty-one years old at the time she was admitted to the hospital.

Apparently the trial court placed considerable weight on the testimony of Dr. Boyle.

Counsel for appellant, in the opening paragraph of the argument in their brief, state that the sole question to be decided is as follows: "What effect does an adjudication of insanity have on the validity of agreements?" Appellant then states that in most of the states, until competency is legally restored, a contract made by a person adjudicated insane is invalid, citing cases from other jurisdictions to sustain the above

contention. Practically all of the cases cited by appellant are based upon express statutory provisions.

We think the first question to be determined is what relationship was created and existed between appellant and respondents. The trial court found that respondents were gratuitous bailees, for the sole benefit of the bailor, and we are in accord with the trial court's view. It does not appear that respondents were to receive any consideration, directly or indirectly, for holding this money. It does not even appear that appellant had given any directions that, in the event of her death during the time the money was held by respondents, they should have charge of the funeral arrangements.

What are the duties of a gratuitous bailee, in regard to the property placed in his care, and when does he become liable for such property to the bailor?

"It is ordinarily stated that where a bailment is for the sole benefit of the bailor, the bailee is liable only for gross negligence or bad faith. Gross negligence in this connection, although variously interpreted and defined by the courts has no very precise or definite meaning. Primarily, gross negligence connotes the absence of slight care or diligence." 8 C. J. S. 278, § 28; 6 Am. Jur. 339, §§ 252 to 262.

See *Bradford-Kennedy Co. v. Buchanan,* 91 Wash. 539, 158 Pac. 76; 100 Wash. 466, 171 Pac. 228; *Corwin v. Grays Harbor Washingtonian,* 159 Wash. 92, 292 Pac. 412.

Under the authorities, then, respondents were liable only if they were grossly negligent in delivering this envelope to appellant's son. Whether or not a gratuitous bailee is guilty of gross negligence, in case of loss or injury to the thing bailed, is always to be ascertained from all the circumstances surrounding the particular bailment in question. Attempts to arbitrarily define gross negligence, without recognition of

this principle, have occasioned much confusion in the language of the courts, confronted as they are with an infinite variety of bailment situations.  6 Am. Jur. 344, § 255.

Appellant bases her conclusion that respondents are liable herein upon the fact that, appellant having been adjudged to be mentally incompetent, and such judgment not having been set aside or modified in any way, the order given by appellant to her son was invalid as to him, because of his mother's insanity, and being invalid as to Gerald, was invalid as to everyone; that therefore respondents, upon being presented with the order, were not legally justified in turning the envelope over to Gerald, and the surrender of the money to Gerald constituted a misdelivery or wrong delivery, for which respondents are liable.

"The bailee's obligation to deliver or account for the property can be satisfied only by a delivery to the person entitled to it, who is ordinarily the bailor himself, someone claiming under him, or one duly authorized on his behalf to receive it.  The bailee is bound, at his peril in case he delivers the property to one other than the bailor, to determine the right of such person to receive it, and as a general rule the only surrender he can rightfully make of the property is on the order of the bailor, express or reasonably implied."  6 Am. Jur. 298, § 210.

Appellant, in speaking of this order as a contract, and referring to contract rights, it seems to us, does not distinguish between the rights she may have had against her son and her rights as against the gratuitous bailee.  While as between appellant and her son the order may have created certain contractual obligations, in so far as respondents are concerned, it was only an order, signed by appellant, directing respondents to turn over the envelope to Gerald.  The liability of

respondents, if any, is a tort liability, and they are liable only in the event they failed to use slight care, or at most such care as a reasonably prudent person would have used, under all the circumstances.

In so far as this record shows, appellant was perfectly normal at the time she delivered the envelope to respondents. No direction was given as to its delivery, so respondents would have been justified in delivering the envelope to some other person upon appellant's order. Delivery was made upon appellant's written order, to her son, the person indicated in the order. The trial court found, and the evidence supports the finding, that respondents had no knowledge that appellant had been committed to Medical Lake, or that she was suffering from any mental·disability at the time she gave the order to her son, or at the time it was presented to respondents.

Mr. Hazen checked the signature on the order with the two signatures on the envelope, before turning it over to Gerald. Under these facts, we are clearly of the opinion that respondents cannot be said to have failed to use slight care, but we are of the opinion, under all the facts, that Mr. Hazen used that care which a reasonably prudent person would have used under the circumstances.

While we are of the opinion that, under the facts in this case, appellant cannot prevail against respondents, regardless of her actual mental condition at the time the order was given, we have no hesitancy in saying that the testimony does not preponderate against the finding of the trial court to the effect that, on the day the order was given, appellant was lucid, and understood the nature and consequences of her acts, and that the order was therefore a perfectly valid instrument.

Regardless of the holdings in other states, we have

announced the rule applicable in this state to the acts of persons committed as insane or mentally incompetent. We stated in *Fletcher v. Miller,* 185 Wash. 299, 52 P. (2d) 304:

"The question of mental competency is essentially one of fact. Before discussing the facts in the case, we should advert to two frequently stated principles: (1) Where a condition of general insanity is once shown to exist, the presumption is that it continues; and the burden of proof to establish a lucid interval or mental restoration rests upon the party who asserts it. . . . "

In *Dean v. Jordan,* 194 Wash. 661, 79 P. (2d) 331, we reaffirmed the rule announced in the *Fletcher* case, *supra,* and further stated:

"If the proof of insanity existing prior to the execution of a will consists of an adjudication of insanity or a decree declaring the person to be *non compos mentis* and placing him under guardianship, the presumption is that such person was incompetent to make a will, and the burden is then upon the proponent to overcome such presumption by showing that the sanity of the testator had been restored or that there was a lucid interval at the time of executing the will, or else that the delusion upon which the adjudication of insanity was based did not affect the will."

It is perfectly apparent, from the rules above announced, that the acts of one judicially determined to be insane or mentally incompetent are not, in this state, void, but may be perfectly valid and binding acts, if made during a lucid interval, or if the acts were not affected by the delusions which were the basis of the adjudication.

Appellant strongly urges that the presumption was not overcome in this case, and particularly stresses the fact that Dr. Boyle's testimony could have no weight, as he did not see appellant until March 1st. We do not agree with appellant's contention. Dr.

Boyle had had many years of experience in dealing with and observing mental patients, and, even though he did not see appellant until March 1st, we think he was qualified to express his opinion, based upon the reasons given by him, as to whether or not appellant was mentally competent to understand and appreciate the effect of the order given by her. This testimony, together with that given by Gerald and by appellant herself, it seems to us, clearly overcame the presumption established by the adjudication.

Respondents have raised some other questions, which we have considered, but, in view of our conclusion herein, do not deem any discussion of them necessary.

We are of the opinion the findings are amply supported by the evidence, and that they support the conclusions and judgment entered. It therefore follows that the judgment of the lower court must be and is affirmed.

ROBINSON, C. J., BEALS, MILLARD, and SIMPSON, JJ., concur.