[No. 573-41110-1.    Division One—Panel 1.    April 13, 1971.]

GERALD L. COLLINS, *Appellant*, v. THE BOEING COMPANY, *Respondent.*

*Sullivan, Guterson, Rindal & Rousso* and *Louis Rousso,* for appellant.

*J. David Andrews, H. Raymond Cairncross, Bruce Michael Cross,* and *Perkins, Coie, Stone, Olsen & Williams,* for respondent.

HOROWITZ, C.J.—Plaintiff Collins sued defendant, the Boeing Company, for the value of tools and a toolbox, alleging that they were lost because of defendant's negligence. The court below entered findings, conclusions and judgment for the defendant. Plaintiff appeals.

There is evidence to support the following statement of the case. Defendant employed plaintiff in November 1965 as a woodworker-toolmaker. In plaintiff's craft, workers traditionally provide their own hand tools. Prior to assuming his duties, defendant supplied plaintiff with a written list of hand tools to be provided by plaintiff at his own expense in order to perform his own work, and informed him that employees are responsible for the care and safety of their own tools and that defendant would not be liable for the loss of such tools or toolboxes. Many additional tools were available to the plaintiff in the regular tool shop maintained by the defendant. Nevertheless, plaintiff thereafter purchased and used on the job more tools than defendant required of him in his progress from his various job levels.

Plaintiff's employment required him to perform his duties within the defendant's plant. Internally, in the protection of its own interests, defendant maintains a 24-hour plant surveillance by numerous guards who go throughout the plant on both scheduled and unscheduled patrols. At the perimeters, both pedestrians and vehicles must pass through gates at which guards are stationed 24 hours a day, 7 days a week. If a loss occurs at the plant, it is investigated by defendant's security division. In numerous instances defendant, through its security division, has been successful in recovering and returning stolen property, both of the employees and of the defendant. Employees found to have stolen property are discharged. The court found that the security system maintained by the defendant was reasonable, efficient and adequate.

Plaintiff is one of about 35,000 Boeing employees in the Seattle area who provide their own tools and toolboxes. An empty toolbox weighs about 10 to 12 pounds, and plaintiff's toolbox and tools weighed about 80 pounds. How much

additional weight was added by additional tools purchased is not in evidence. Defendant provides no receptacle for the tools and toolboxes, and there is no provision for chaining toolboxes to the workbench to prevent toolboxes from being carried away or stolen. The toolbox is of the locking type and plaintiff had the only keys to his own box and only he knew its contents. However, defendant's supervisors periodically require employees to undergo toolbox inspections in order to check the presence of Boeing tools, and the toolboxes are required to be marked for identification purposes with a Boeing seal. At the conclusion of their working day when they leave the plant, employees may either take their tools and toolboxes with them, or they may leave the tools and toolboxes on or near their workbenches in the plant. Employees generally leave their toolboxes at the plant at the conclusion of their working day to serve their own convenience. If they take their toolboxes with them, permission so to do has to be obtained from their immediate supervisor and the toolbox has to be opened and checked prior to leaving. Hence employees' exit from the plant means delay. Furthermore, in a number of instances in order to reach their cars employees would have to carry their toolboxes as much as several blocks from their workbenches through the company toolroom and company gates. After exit from the plant, reentry can take place after proper identification. These exit and ingress requirements are part of the 24-hour a day security arrangements maintained by the defendant as above described.

There is no evidence that plaintiff otherwise delivered custody or possession of his toolbox containing his tools to the defendant, or that the defendant took their custody, control or possession. The basic reason for the plaintiff leaving his toolbox in the plant was to serve his own convenience. There was some evidence that by doing so defendant was incidentally benefited through reduction of exit or ingress delays and possible speedup in work by reason of additional tools supplied by the plaintiff. How-

ever, the evidence showed that these incidental benefits were not requested by the defendant and were the unavoidable consequences of serving plaintiff's convenience. There is no evidence that the defendant ever departed from its policy of nonliability except in those cases in which it took actual physical control of the tools. The plaintiff and other employees were aware of the defendant's policy, but it was only after plaintiff's loss of his toolbox that the union, of which plaintiff is a member, undertook collective bargaining procedures to change defendant's policy. No change, however, was agreed upon.

Except for knowledge of the collective bargaining proceedings occurring subsequently, plaintiff knew all or substantially all the facts above recited on February 18, 1967 when he completed his work shift at 3:30 p.m. He then placed his tools in his toolbox, locked the box with his key, retained possession of the key, and then left the toolbox on top of his workbench in accordance with his prior practice and the practice of his fellow employees. Plaintiff then checked out of the plant's guarded gates. Plaintiff returned to work on the morning of February 19, when he was readmitted to the plant. There had been no working shift between the time plaintiff left the plant on February 18 and the time he returned. When he returned he found his toolbox containing his tools gone and it was never found. There is no claim nor evidence that the defendant itself ever appropriated plaintiff's toolbox containing his tools.

■ Plaintiff makes three assignments of error. Two are directed to the sufficiency of the evidence to support portions of two findings. We find the evidence and reasonable inferences therefrom sufficient so that the findings are binding upon us. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959). The third assignment raises the question of the sufficiency of the findings to support the conclusions.

The court concluded from the foregoing facts that with respect to plaintiff's toolbox containing his tools, there was

no bailment so that defendant owed plaintiff no duty to prevent their theft. This conclusion was predicated upon the subordinate conclusions that there were neither change of possession of the subject matter from the plaintiff to the defendant, nor acquisition and acceptance of exclusive possession and control by the defendant. Furthermore, the court concluded that the defendant's security precautions were reasonable and efficient and the defendant was in no way negligent. It may be that the conclusions above described are also in large part factual findings binding upon us, making further discussion largely unnecessary. *See Ferree v. Doric Co.,* 62 Wn.2d 561, 383 P.2d 900 (1963); *McCutcheon v. Brownfield,* 2 Wn. App. 348, 356, 467 P.2d 868 (1970). *See Gray v. Fuller,* 85 Wash. 13, 147 P. 402 (1915). However, we believe that the plaintiff's contentions and the general importance of the issues raised require that the principles involved be further explored.

We hold that the judgment below should be affirmed because as between the parties with respect to the plaintiff's own toolbox and tools, defendant owed plaintiff no duty to prevent their theft by third persons, either by virtue of contract principles, *i.e.,* bailment, or tort principles. If, however, a duty of care existed, the trial court had the right to find that the defendant discharged the duty by its security measures.

■ Plaintiff first contends that the defendant is under a contractual duty to protect his toolbox containing his tools against theft by third persons on contract principles predicated upon the existence of a bailment relationship between the parties. Under the evidence here, we find no bailment. Except in the so-called constructive or involuntary bailment cases in which a duty of care is recognized, *e.g.,* possession taken by a finder, or possession taken by mistake, or because involuntarily thrust upon another, bailment normally is a consensual transaction. As stated in R. Brown, The Law of Personal Property § 91, at 399 (2d ed. 1955):

The bailor intentionally delivers possession of his goods

to the bailee and the latter accepts the same with a real or a presumed knowledge of the responsibility entailed thereby.

*See also* R. Brown, The Law of Personal Property §§ 73, 11, 15 (2d ed. 1955); *D. A. Schulte, Inc. v. North Terminal Garage Co.,* 291 Mass. 251, 197 N.E. 16 (1935); 8 Am. Jur. 2d *Bailments* §§ 55, 57 (1963); Annot., 1 A.L.R. 394, § 1(a) (1919). *See also Ramsden v. Grimshaw,* 23 Wn.2d 864, 162 P.2d 901 (1945). Resort to the concept of constructive or involuntary bailment on which to base a duty of care is unnecessary here. There is sufficient evidence from which the court could find that the mutual intention of the parties, manifested by their conduct, prevented a consensual bailment from arising. We know of no public policy that requires us to substitute a constructive or involuntary bailment responsibility which the parties by mutual manifest intention have rejected.

█ Before a consensual bailment of personal property may be said to arise, there must be a change of possession and an assumption or acceptance of possession by the person claimed to be a bailee. *Theobald v. Satterthwaite,* 30 Wn.2d 92, 190 P.2d 714, 1 A.L.R.2d 799 (1948); *Ramsden v. Grimshaw, supra; see* R. Brown, The Law of Personal Property §§ 74, 75 (2d ed. 1955); 8 Am. Jur. 2d *Bailments* § 54 (1963); Annot., 7 A.L.R.3d 927, § 3 (1966). Whether there is a change or acceptance of possession depends on whether there is a change or acceptance of actual or potential control in fact over the subject matter. Such control may be actual or physical, or it may be constructive—recognized by law as the equivalent of actual control. In determining whether control exists, it is relevant to consider the subject matter's amenability to control, steps taken to effect control, the existence of power over the subject matter, the existence of power to exclude others from control, and the intention with which the acts in relation to the subject matter are performed. Thus, one who pays a fee to a parking lot operator, parks his car himself on the parking operator's lot and retains his own keys, does not thereby change

possession of his car to the parking lot operator so as to create a bailment. *Wall v. Airport Parking Co.*, 41 Ill. 2d 506, 244 N.E.2d 190 (1969); *Allright Phoenix Parking, Inc. v. Shabala*, 6 Ariz. App. 21, 429 P.2d 513 (1967); *Taylor v. Philadelphia Parking Authority*, 398 Pa. 9, 156 A.2d 525 (1959); 9 S. Williston, Contracts § 1065 (3d ed. 1967); Annot., 131 A.L.R. 1175, 1176-84 (1941). If, however, the parking lot operator gives the person parking his car a claim check and receives a key to the car, thus giving him control over it, then there is both change and assumption of possession and a bailment is thereby created. *Ramsden v. Grimshaw, supra.*

In addition to physical control over the thing possessed, there must be a manifested intention to exercise that control. Accordingly, the intention of the parties accompanying the acts in relation to the subject matter involved is explanatory of the nature and significance of the acts on the issue of change or assumption of possession. Thus, the intention of the person who leaves personal property on the land occupied by another is relevant to the issue of whether a change of possession has taken place. He may have left the property with a view to reclaiming it, as is the case here; or left it with a view to abandoning it; or left it by way of delivery to the occupier of the land who by prearrangement has agreed to treat the personal property so left as delivered. Correspondingly, on the issue of the land-occupier's acceptance or assumption of possession, the occupier may have no intention with respect to the personal property for want of knowledge of its existence, as may possibly be the case here; or the occupier's intention may be merely to permit the personal property to remain on the premises without any intention to assume either custody or possession, as the defendant contends is the case here; or the occupier's intention may be to reject or remove the personal property. In each of these cases, the existence and nature of physical control and the intention of the respective parties with respect to the personal property involved are questions of fact provable by direct or circum-

stantial evidence. Accordingly, whether change of possession or assumption or acceptance of possession has occurred are questions of fact. The foregoing principles dealing with change and assumption or acceptance of possession and the manner of their proof finds wide support in the authorities. Some of these are *Theobald v. Satterthwaite, supra; Ramsden v. Grimshaw, supra; Spare v. Belroy Housing Corp.,* 179 Wash. 385, 38 P.2d 207 (1934); *Rust v. Shamrock Oil & Gas Corp.,* 228 S.W.2d 934 (Tex. Civ. App. 1950); *H. S. Crocker Co. v. McFaddin,* 148 Cal. App. 2d 639, 307 P.2d 429 (1957); 8 Am. Jur. 2d *Bailments* §§ 56, 59, 60 (1963); Annot., 1 A.L.R. 394 (1919); R. Brown, The Law of Personal Property § 10, at 19-22, § 74 (2d ed. 1955); J. Salmond, Jurisprudence §§ 52-53 (12th ed. P. Fitzgerald 1966).

In the instant case, the trial court could draw more than one inference concerning the existence of the constitutive elements of bailment. Defendant's security provisions, including ingress and egress requirements, might suggest change of control by plaintiff and assumption of control of the toolbox by defendant with resulting imposition upon defendant of a duty of care to prevent its theft by third persons. There is other evidence, however, that the security measures were adopted to protect defendant's plant and defendant's own personal property therein—measures which might also serve to protect plaintiff's toolbox and tools as a matter of accommodation. That this was so is confirmed by the fact that from the inception of the employment relationship and without objection by the plaintiff, and consistent with industry practice, defendant had disclaimed any responsibility for theft by third persons. Accordingly, as plaintiff at all times knew, defendant provided no receptacles, lockable enclosures, chains or other lines affixed to benches or posts to which the toolbox containing the plaintiff's tools could be tied to prevent wrongful removal. There is no evidence that prior to the theft in the instant case plaintiff, by himself or through his labor union, ever objected to the initial and continuing policy of nonliability. The trial court could find that plaintiff, by

manifest intention and for his own convenience and without defendant's request and at his own risk, left his toolbox containing all his tools, both required and not required, at the plant at the close of the working day without changing their possession to the defendant; and that the defendant took neither custody, control, nor possession of the toolbox and tools in the sense required by the law of bailment. We know of no public policy that requires us to fail to give effect to the manifest intentions of the parties here. *See H. S. Crocker Co. v. McFaddin, supra,* 307 P.2d at 433. It is true that if all employees took their tools from the plant at the close of the working day and then brought the tools back with them when they returned to work, substantial delays on exit and ingress would have resulted. This was a risk defendant was apparently willing to assume. However, the fact that the employees did not take their tools with them is evidence that the defendant found it unnecessary to change its policy of nonliability and did not do so.

■■ If notwithstanding what has been said a duty of care arose under bailment principles, consensual, constructive or involuntary, defendant would be liable here if it failed to exercise reasonable care to protect the toolbox and tools against theft by third persons; and the bailment being gratuitous, the obligation would be discharged by the exercise of slight care. *Nist v. Tudor,* 67 Wn.2d 322, 324, 407 P.2d 798 (1965); *Maitlen v. Hazen,* 9 Wn.2d 113, 113 P.2d 1008 (1941); 9 S. Williston, Law of Contracts § 1038 (3d ed. 1967). *Cf. Murphy v. Schwark,* 117 Wash. 461, 201 P. 757 (1921). The court, it is true, made no express finding upon the significance of lack of receptacles, lockable enclosures, chains or other lines to protect the plaintiff's toolbox from theft. It is conceivable that had these additional protections been furnished, the theft would have been prevented. There is no express evidence on this point. However, reasonable care should be differentiated from maximum care. The court found and concluded that the care the defendant actually exercised by the maintenance of the security system was reasonable, efficient and adequate, and that the

defendant "was in no way negligent." *See* R. Brown, The Law of Personal Property §§ 80, 83 (2d ed. 1955); 8 Am. Jur. 2d *Bailments* §§ 207-219 (1963); *Ramsden v. Grimshaw, supra; Theobald v. Satterthwaite, supra.* It is true that theft was not thereby prevented. However, such express findings and conclusions necessarily include the implied finding and conclusion that reasonable care did not additionally require the use of receptacles, lockable enclosures, chains or other lines. *Whatcom Builders Supply Co. v. H. D. Fowler, Inc.,* 1 Wn. App. 665, 463 P.2d 232 (1969). We cannot say that the evidence is insufficient to support such express and implied findings.

Plaintiff contends, however, that irrespective of bailment principles, defendant employer had an alternative duty to exercise reasonable care under all the circumstances to prevent the theft of the tools used on the job and here involved. The contention is predicated upon the analogical application of the special duty of an employer with respect to the condition of the workman's premises considered in *Siragusa v. Swedish Hosp.,* 60 Wn.2d 310, 373 P.2d 767 (1962). In our opinion, neither *Siragusa* nor its doctrine requires the imposition of liability upon defendant. In that case the court reaffirmed the duty of an employer to use reasonable care to furnish an employee with a safe place to work and safe appliances with which to work. As a corollary to that doctrine, the court abandoned its former rule that an employee assumed the risk of his employer's negligence in violating the latter's duty of care because the assumption of risk doctrine derogates unnecessarily from the employer's basic duty of care. The court still retained the distinguishable defense of employee's contributory negligence in voluntarily exposing himself to the risks of personal injury that existed notwithstanding the employer's reasonable care. *See* 38 Am. Jur. *Negligence* §§ 171-73 (1941).

*Siragusa,* however, did not involve the possible duty of an employer to alter his premises by providing receptacles or chains to be affixed thereto so as to protect the employ-

ee's own tools used on the job but left at the premises at the close of the working day, from theft by third persons; nor did *Siragusa* involve the additional question whether an employee could assume the risk of theft of his tools by agreement, express or implied, with his employer.

*Siragusa* proceeds upon the premise that it is the employer who selects the premises and furnishes the tools with which the employee must work; and that it is unreasonable for an employer to impose upon the employee the danger to his person resulting from the employer's carelessness concerning the condition of the premises and tools so furnished and in the selection and care of which the employee has little or no say. Accordingly, to impose a doctrine of assumption of risk is to impair and derogate from the law-imposed duty of care arising from the employee's inextricable necessities. The situation raising a duty is not the same in the case of the employee's own tools optionally left by the employee at the plant at the close of the working day. The employee knows the condition of the plant, *e.g.*, absence of receptacles or chains, and does have a say as to whether he will expose himself to the risk of theft caused by the condition of the plant. He can both continue his employment and yet choose whether or not to take his tools with him, and thus avoid their theft. The risk is an avoidable one. If to serve his own convenience he chooses to leave the tools at the plant, he must be deemed to do so in light of the generally recognized principle that there can be no recovery for reasonably avoidable harm, whether to person or property. *See* generally 4 Restatement of Torts § 918 (1939); 1 Restatement of Contracts § 336 (1932); C. McCormick, Handbook on the Law of Damages § 33 (1935); 38 Am. Jur. *Negligence* § 172 (1941). Furthermore, if the employee has agreed in fact that the employer shall not be liable for theft by third persons, he can scarcely complain that the employer failed to alter the premises to prevent the very theft the risk of which the employee chose to take. It is no answer to say that the tools are too heavy and the distance they must be carried too great so that the option

or choice is illusory. The evidence does not show the weight of the employer-required tools as distinguished from the total weight of the tools, including those added by the employee but not required by the defendant. Furthermore, the implied in fact agreement of nonliability—the legally voluntary character of which is not attacked—is not conditioned on the weight of the tools, the distance to be taken, nor the inconvenience of their daily removal.

It is true that the doctrine of avoidable harm involving an employee's own negligent conduct is still available under the still viable doctrine of contributory negligence. That fact, however, does not require that the independent defense of assumption of risk based on the mental state of willingness to assume the risk of theft regardless of defendant's failure to alter its premises, must go by the board. *Siragusa* rejected the defense of assumption of risk of the condition of the employer's premises and the employer's tools (while retaining the defense of contributory negligence) because of the employee's inextricable necessities. It does not follow, however, that the same result is required in the situation serving the employee's convenience. Especially does it not follow when such a result would be contrary to the intention of the parties. *See* 38 Am. Jur. *Negligence* § 172 (1941). Were we to hold otherwise, out of an understandable concern for the plaintiff's plight in the instant case, we are fearful that we would be injecting a new principle into the law which "will become the parent stock from which a motley progeny will spring." *See* dissenting opinion of Clarkson, J., in *Oliver v. Raleigh*, 212 N.C. 465, 471, 193 S.E. 853 (1937), quoted by Justice Weaver in *In re Elliott*, 74 Wn.2d 600, 645, 446 P.2d 347 (1968).

Furthermore, if by reason of *Waller v. Smith*, 116 Wash. 645, 200 P. 95 (1921), it is proper to make analogical use of the rules concerning the duty of care owed in land-occupier cases to persons rather than personalty, we arrive at a similar conclusion of nonliability, but for other reasons. Bailment principles are applicable to personal property whether or not that personal property is on the land of

another. Land-occupier rules concerning the duty of care owed apply to persons while on the land-occupier's land. When, however, the personal property involved is also on the land, as in the case of tools left thereon by a carpenter, plumber or electrician, one may consider the possible application of both bailment and land-occupier rule concepts to the personal property in order to determine whether the landowner is under a duty to protect such property against theft by altering his premises. We have already determined that no such duty to safeguard exists on bailment or employer-employee relationship principles. Assuming, however, that the relationship between the parties during the working day is an invitor-invitee relationship because of the mutual or potential business interests of the invitor (*Dotson v. Haddock,* 46 Wn.2d 52, 278 P.2d 338 (1955); *McKinnon v. Washington Fed. Sav. & Loan Ass'n,* 68 Wn.2d 644, 414 P.2d 773 (1966); *Plaisted v. Tangen,* 72 Wn.2d 259, 432 P.2d 647 (1967)), then the most that can be said for the relationship with respect to the tools left for the convenience of the employee rather than for the economic benefit of the employer, is that the relationship is reduced to one no greater than that of licensor-licensee in which incidental benefits to the licensor do not create an invitor-invitee relationship. *See Dotson v. Haddock, supra.*

When a licensor-licensee relationship exists, the licensor is under a duty to refrain from injuring the licensee by his active negligence and to refrain from injuring the licensee by the licensor's wanton or willful conduct caused by the condition of the premises. In *Waller v. Smith, supra,* the latter portion of the licensee rule was applied in denying liability for damage to a car left by a trespasser or licensee upon the property of a land-occupier. In the later case of *Potts v. Amis,* 62 Wn.2d 777, 384 P.2d 825 (1963), the court limited the willful-wanton conduct rule to injuries caused by the condition of the premises, but did not otherwise overrule *Waller v. Smith, supra.*[1]

---

[1] By parallel reasoning, if a car was left on a commercial parking lot by an invitee but without creation of a bailment because of no change

In the instant case, the theft of the tools and toolbox, according to the plaintiff, was due to the failure of the defendant to alter its premises by providing receptacles, lockable enclosures, lines or chains to protect the toolbox against theft. There is no claim, evidence or finding that the theft of the tools and toolbox was due to defendant's willful or wanton conduct (as defined, for example, in *Mendenhall v. Siegel*, 1 Wn. App. 263, 462 P.2d 245 (1969)), concerning the condition of the premises. The resulting conclusion of nonliability is further supported by the implied disclaimer of liability agreement and the presence of defendant's reasonably adequate security measures. Cf. *Sporsem v. First Nat'l Bank*, 133 Wash. 199, 233 P. 641, 40 A.L.R. 854 (1925); *Ramsden v. Grimshaw, supra*.

What we have here is a privilege to leave employee's own toolbox at the plant without an assumption of possession by the employer, and subject to a condition of nonliability for theft by third persons. Such a privilege does not create a duty to protect against such theft. Thus, in *Belofsky v. State Ins. Fund*, 46 Misc. 2d 834, 260 N.Y.S.2d 855 (Ct. Cl. 1965), an employee lost his coat which he had placed on a coatrack supplied by the employer. The court held that the employer was not liable for the loss of the coat because his intention at most was "to confer a favor and not to accept responsibility for the exercise of care." 260 N.Y.S.2d at 857. *See also Wall v. Airport Parking Co.*, 41 Ill. 2d 506, 244 N.E.2d 190 (1969); *Theobald v. Satterthwaite, supra. See* Restatement (Second) Torts, Comments, §§ 341-44 (1965). If the employee or employer intends an accommodation to the other without creating a duty of

---

of possession, no duty of care by the car lot operator would arise based on the existence of bailment. However, a duty of care could arise based on an invitor-invitee relationship. *See Wall v. Airport Parking Co.*, 41 Ill. 2d 506, 244 N.E.2d 190 (1969); 7 A.L.R.3d 927, § 4 (1966). To what extent a disclaimer of a liability would limit the duty of care in such a case, we do not determine. Annot., 7 A.L.R.3d 927, § 5(a) (1966).

care, we know of no applicable public policy that requires the frustration of their respective intentions.

The judgment is affirmed.

UTTER and WILLIAMS, JJ., concur.