[No. 18128-2-II. Division Two. August 9, 1996.]

KEN NIVENS, *Appellant*, v. 7-11 HOAGY'S CORNER, ET AL., *Respondents.*

34

*Samuel H. Pemberton, Jr.*, for appellant.

*John C. Moore* and *Bonneville, Viert, Morton & McGoldrick*, for respondents.

MORGAN, J. — Ken Nivens filed this personal injury action, alleging he was assaulted by loiterers in the parking lot of a 7-11 store.[1] The trial court entered a judgment of dismissal, which we affirm.

Between 9:30 and 10:00 p.m. on December 26, 1988, Nivens drove to the 7-11 store at 40th and Bridgeport Way for the purpose of making a purchase. About a dozen teenagers were in the parking lot, "talking in little crowds" and "just messing around, kidding with each other."[2] They had been there about an hour, and there was no security guard on the premises.

As Nivens parked and got out of his car, a male loiterer approached and asked him to buy beer. When Nivens refused, several loiterers began calling him names. He tried to walk to the store's entrance, but one or more of the loiterers grabbed him from behind. In the ensuing incident, he was hit in the head, neck, and shoulder, thrown to the ground, and kicked in the ribs, lower back, and head.[3]

For about six years before the incident, teenagers had congregated in the store's parking lot. The number varied from 10 to 100, but groups of 15 to 25 were "[p]retty com-

---

[1]The store was a franchise of the Southland Corporation. For convenience, we refer to all defendants as the store.

[2]Clerk's Papers at 311-314; *see also* Clerk's Papers at 6-8.

[3]One witness, Shadduck, states that Nivens entered and left the store before the assault took place. Clerk's Papers at 37.

mon.''[4] Clerks ''sometimes . . . [had] trouble with [teenagers] inside the store,'' and with ''noise, whatever, outside of the store.''[5] At times, loitering teenagers would ask customers to buy beer for them, or they would bring their own beer and drink it in the parking lot. The store had posted a sign saying, ''no soliciting, no loitering, no loud music.''[6]

Although loitering teens had occasionally fought among themselves, they had never, until the incident with Nivens, acted violently toward a customer of the store. A sheriff's deputy who had worked at the store as a part-time security guard states:

> When I worked [at the store], I had to ask some loiterers to move on occasionally, but the store was very quiet. I never had a problem with violence at the store.[7]

One of the clerks, Anderson, states:

---

[4]Clerk's Papers at 98.

[5]Clerk's Papers at 63, 324.

[6]Clerk's Papers at 14, 35, 50.

[7]Clerk's Papers at 361. Less specifically, the same deputy's declaration also states:

> [Beginning in 1983] stores in Pierce County including the Steilacoom store and Tillicum store were experiencing problems with high school to late teen-age kids, primarily males, hanging out in groups and loitering in the parking lot and storefront areas. Loitering of this type often tends to involve the consumption of alcohol and drugs and leads to fights/assaults. I have worked primarily at the Steilacoom and Puyallup (South Hill) store.
>
> . . . .
>
> Our goal and purpose in not allowing loitering or gathering of the teenagers or young adults in the store parking lots is [to] prevent fights and/or assaults. When groups of mid-teens to 20 year olds are allowed to congregate and loiter in one area the most common problems that occur are fights or assaults.
>
> . . . .
>
> [N]umerous stores in Pierce County were having problems with teenagers and other people loitering and causing problems in their parking lots. This has continued to be a problem in various stores throughout Pierce County from 1983 through present if adequate security is not provided.

Clerk's Papers at 13-15.

Over the year [I was] there . . . I do not recollect any customer ever having a fight or a real altercation with any of the people in the parking lot, coming into the store. They used to have fights among themselves. But as far as bothering the clients coming into the store, we had very little of that.[8]

The youth who initially asked Nivens to buy beer states:

Other than my altercation with Mr. Nivens, I am only aware of only one other fight on or near the premises of the 7-11/Hoagy's Corner at 40th & Bridgeport. That was approximately four months before the incident with Mr. Nivens when two high school kids arranged to meet at the store to fight after school. This fight occurred at approximately 3 p.m. after school. I do not believe that the store employees could have known of the existence of the fight because it occurred along the side of the building where there were no windows and it may have occurred in the bank parking lot next door. At no time when I was at the premises of the 7-11/Hoagy's in question did I ever see anyone assault, accost, or otherwise bother a customer, except to occasionally ask a customer to buy beer.[9]

A consultant for the store states that the loiterers were not "gang-type kids. . . . They were just high school age kids hanging out."[10] She adds that the store has no record

---

[8]Clerk's Papers at 65. *See also* Clerk's Papers at 340, where Anderson states, "During my tenure at the store, I have no knowledge of any other customer being assaulted on the premises besides Mr. Nivens."

[9]Clerk's Papers at 7. Another youth, Shadduck, states:

There has been an incident filed with Pierce County that there was [sic] shots fired in the parking lot at the store . . . [that happened] approximately 3 months [prior to the assault against Nivens].

Clerk's Papers at 38-39. Although Shadduck says his statement is "based upon [his] personal knowledge," Clerk's Papers at 33, he does not indicate whether he was present, whether any customers were present, the identity of anyone involved, or any other circumstances.

[10]Clerk's Papers at 49.

of complaints about loiterers from customers or nearby residents.[11]

As Nivens points out, the store had adopted several pertinent policies prior to the date of the incident. If a clerk saw loiterers drinking in the parking lot, he or she was to ask those persons to dispose of the alcohol and leave immediately. If a clerk became aware of loiterers accosting customers, he or she was to tell the loiterers to leave and, if they failed to comply, to call the police. But, "[i]f the loiterers were not causing any problems or inconvenience to the store's customers, no action would be taken."[12]

As Nivens further points out, the store also had at least two written manuals. One, on avoiding conflict, instructed clerks to tell loiterers to leave, and to call police in the event of noncompliance. Another, on preventing robberies, instructed clerks to observe the store's parking lot, but remain in the store at night.

At the time of the assault on Nivens, two clerks, Charlie Washington and Kathleen Anderson, were working inside the store. They had not asked the loitering teenagers to leave.

On June 28, 1990, Nivens sued the store for negligence. On May 15, 1992, the store moved for summary judgment. Nivens responded, in part, by filing a declaration in which a security professional named Roy Shaw opined that allowing teenagers to loiter over an extended period leads to assaults and fails to "meet the custom and practices expected of a retail store . . . ."[13] Shaw further opined

---

[11]Reports in the store's possession show an incident of vandalism on August 26, 1986; vehicle damage to the store on November 29, 1987; and three armed robberies occurring on December 14, 1986, October 31, 1988, and November 5, 1988, respectively. None of these incidents are linked to the teens who were loitering on December 26, 1988.

[12]Clerk's Papers at 10; *see also* Clerk's Papers at 36, 50, 340.

[13]Clerk's Papers at 171.

that "prudence as well as reasonable care[ ] would require that this situation be corrected by hiring adequate security personnel to patrol the area and break the habit and cycle of kids gathering on the premises."[14] On June 15, 1992, the trial court denied the store's motion for summary judgment.

On February 28, 1994, just before trial, the store moved for an order excluding evidence that it had failed to hire, or should have hired, security guards. On March 4, 1994, the trial court granted the requested order. Immediately thereafter, Nivens declined to proceed to trial, asserting that his claim was "based solely on the failure of [the store] to hire security personnel to deal with the loitering . . . before the time that this assault occurred . . . ."[15] Ruling that "there is not an affirmative duty for a merchant business to supply security personnel in the situation we are talking about here," the trial court dismissed the complaint.[16] Nivens then filed this appeal.

■ In a negligence action like this one, the elements are duty, breach, causation and damages.[17] Only duty and breach are in issue here. Moreover, they are in issue only with respect to the store's conduct *before* the assault on Nivens began. Nivens does *not* contend that the store

---

[14]Clerk's Papers at 172. *See also* Clerk's Papers at 14, where a deputy states, "[I]t has been my experience that if adequate security is provided at 7-Eleven stores in Pierce County, kids and teenagers can be prevented and discouraged from loitering in the store parking lots."

[15]Supplemental Report of Proceedings (Mar. 4, 1993) at 4.

[16]Supplemental Report of Proceedings (Mar. 4, 1993) at 6.

[17]*Hansen v. Friend,* 118 Wn.2d 476, 479, 824 P.2d 483 (1992); *Hartley v. State,* 103 Wn.2d 768, 777, 698 P.2d 77 (1985); *Schooley v. Pinch's Deli Market, Inc.,* 80 Wn. App. 862, 865-66, 912 P.2d 1044 (1996).

failed to exercise reasonable care *after* the assault had begun.[18]

## I. DUTY

■ Duty is a question of law.[19] Thus, it is to be answered generally, without reference to the facts or parties in a particular case.[20]

Duty has three facets. (1) By whom is it owed? (2) To whom is it owed? (3) What is the standard of care? The first question defines an obligated class, while the second defines a protected class.[21]

The first question is the one in issue here. It is undisputed that the protected class is comprised of all invitees, and that the standard of care is reasonable care.

The duty owed by an occupier of land to an invitee has at least two components. One relates to physical conditions on the premises. The other relates to human activities on the premises.[22]

The first component is described in RESTATEMENT (SECOND) OF TORTS §§ 343-343A (1965). Entitled "Danger-

---

[18]Nivens states in his brief:

It is further plaintiff's theory that, if proper security guards or personnel had been utilized by defendant the loitering cycle could have been broken and stopped well before the date that plaintiff was injured. It is not plaintiff's theory that security guards should have been present on the night plaintiff was injured and should have specifically prevented the assault on the plaintiff.

Br. of Appellant at 13.

[19]*Degel v. Majestic Mobile Manor, Inc.*, 129 Wn.2d 43, 48, 914 P.2d 728 (1996); *Tincani v. Inland Empire Zoological Soc.*, 124 Wn.2d 121, 128, 875 P.2d 621 (1994); *Hutchins v. 1001 Fourth Ave., Assocs.*, 116 Wn.2d 217, 220, 802 P.2d 1360 (1991); *Schooley*, 80 Wn. App. at 866; *Niece v. Elmview Group Home*, 79 Wn. App. 660, 668, 904 P.2d 784 (1995), *review granted*, 129 Wn.2d 1005 (1996); *Shepard v. Mielke*, 75 Wn. App. 201, 205, 877 P.2d 220 (1994); *Howard v. Horn*, 61 Wn. App. 520, 523, 810 P.2d 1387, *review denied*, 117 Wn.2d 1011 (1991).

[20]*Schooley*, 80 Wn. App. at 866.

[21]*Schooley*, 80 Wn. App. at 866-68.

[22]It appears that each component is regularly recognized in Washington practice. See the brackets in, and Notes on Use that accompany, 6 WASH. PRAC., WPI, §§ 120.06 and 120.06.01 at 609-12.

ous Conditions Known to or Discoverable by Possessor," § 343 provides:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger.

Entitled "Known or Obvious Dangers," § 343A elaborates on paragraph (b) of § 343. It provides:

> (1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.
>
> (2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated.

Sections 343-343A have been adopted by the Washington Supreme Court.[23]

The second component, human activities on the premises, is described in RESTATEMENT (SECOND) OF TORTS §§ 341A and 344 (1965). RESTATEMENT § 341A deals with activities of the occupier, while RESTATEMENT § 344 deals with activities of third persons. Here, we are concerned only with the activities of third persons, so we consider

---

[23]*Iwai v. State*, 129 Wn.2d 84, 915 P.2d 1089, 1093-94 (1996); *Degel*, 129 Wn.2d at 48; *Tincani*, 124 Wn.2d at 138-39.

only § 344.[24] Entitled "Business Premises Open to Public: Acts of Third Persons or Animals," § 344 provides:

A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to

(a) discover that such acts are being done or are likely to be done, or

(b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.

Section 344 has been applied by Division One and discussed by this division.[25]

Sections 343-343A and 344 spring from different roots. Sections 343-343A originated in the English case of *Indermaur v. Dames*.[26] Section 344 originated not in *Indermaur*, but "in cases of carriers who failed to protect their pas-

---

[24]Parenthetically, § 341A provides:

A possessor of land is subject to liability to his invitees for physical harm caused to them by his failure to carry on his activities with reasonable care for their safety if, but only if, he should expect that they will not discover or realize the danger, or will fail to protect themselves against it.

As far as we are aware, § 341A has not been considered or cited in any Washington case. It is quoted, however, at 6 WASH. PRAC., WPI, § 120.06.01, revised comment, supplement page 126.

[25]*Passovoy v. Nordstrom, Inc.*, 52 Wn. App. 166, 172, 758 P.2d 524 (1988), *review denied*, 112 Wn.2d 1001 (1989); *Lauritzen v. Lauritzen*, 74 Wn. App. 432, 439-40 n.3, 874 P.2d 861, *review denied*, 125 Wn.2d 1006 (1994); *cf. Collins v. Boeing Co.*, 4 Wn. App. 705, 719, 46 A.L.R.3d 1294, 483 P.2d 1282 (1971).

[26](1866) L.R. 1 C.P. 274, 35 L.J.C.P. 184, affirmed L.R. 2 C.P. 311, 36 L.J.C.P. 181. *See* W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 61, at 419 (5th ed. 1984). In *Indermaur*, a gasfitter was invited into the defendant's refinery to test a piece of equipment. He fell into an unguarded hole and later sued for his injuries. The court held he was owed a duty of reasonable care, because he came "on business which concerns the occupier, and upon [the occupier's] invitation, express or implied." PROSSER AND SMITH, CASES AND MATERIALS ON TORTS 511 (3d ed. 1962).

sengers against the acts of third persons."[27] Sections 343-343A apply whenever the land is held open to an invitee,[28] while § 344 applies only when land is held open to the public.[29]

Sections 343-343A and 344 reflect different ideas. Sections 343-343A are based on the notion that an occupier who for its own purposes encourages another to enter the premises impliedly represents that reasonable care has been exercised to make the place safe.[30] Section 344 appears to be based on the notion that one who controls any confined space, into which he or she invites the public, has an obligation of reasonable care to observe and control activities within that space.[31] Section 344 is an exception to the general rule that one person has no duty to control another person's conduct.[32]

Sections 343-343A reflect a duty to inspect and a duty to remedy. The duty to inspect is a duty of reasonable care to inspect the premises and discover unreasonably hazardous conditions.[33] The duty to remedy is a duty of reasonable care to remedy unreasonably hazardous conditions, by repair, removal, warning, or otherwise.[34] The duty to inspect may exist whenever an invitee is to come onto the land, but the duty to remedy does not arise until a reasonable person in the same circumstances as the defendant

[27]RESTATEMENT (SECOND) OF TORTS § 344, cmt. a.

[28]*See Indermaur, supra* (invitee present on land not open to public).

[29]RESTATEMENT (SECOND) OF TORTS § 344, cmt. a.

[30]KEETON § 61, at 422 (1984).

[31]*See Niece,* 79 Wn. App. at 665.

[32]*Hutchins,* 116 Wn.2d at 227; *Petersen v. State,* 100 Wn.2d 421, 426, 671 P.2d 230 (1983); *Lauritzen,* 74 Wn. App. at 438.

[33]*Iwai,* 129 Wn.2d 84; 915 P.2d at 1094; *Tincani,* 124 Wn.2d at 139; *Egede-Nissen v. Crystal Mountain, Inc.,* 93 Wn.2d 127, 132, 606 P.2d 1214 (1980); 6 WASH. PRAC., *Washington Pattern Jury Instructions: Civil,* § 120.06 (revised cmt.) at supplemental 124, § 120.06.02 (cmt.) at 613; RESTATEMENT (SECOND) OF TORTS, § 343, cmt. b.

[34]*Tincani,* 124 Wn.2d at 139; *Wiltse v. Albertson's Inc.,* 116 Wn.2d 452, 461, 805 P.2d 793 (1991); *Miniken v. Carr,* 71 Wn.2d 325, 329, 428 P.2d 716 (1967); 6 WASH. PRAC. § 120.06.02 (cmt.) at 613.

would perceive an unreasonably hazardous condition on the land, and thus an unreasonable risk of harm to invitees.[35] When a reasonable person would so perceive depends on whether the condition is created by the conduct of the defendant, including its general mode of operation,[36] or by the conduct of a third person.[37]

Similarly, § 344 reflects a duty to observe and a duty to intervene. The duty to observe is a duty of reasonable care to observe activity on the premises.[38] The duty to intervene is a duty of reasonable care to prevent or control such activity as is unreasonably hazardous to others, by ejection, restraint, or other appropriate means.[39] The duty to observe may exist whenever the premises are open to the public, but the duty to intervene arises only when a reasonable person in the same circumstances as the defendant would know, to use the words of § 344, that the accidental, negligent, or intentionally harmful acts of third persons "are being done or are likely to be done." In other

[35]See, e.g., Iwai, 129 Wn.2d 84, 915 P.2d at 1094-97 (plaintiff must establish "actual or constructive notice" of hazard, that it is "foreseeably inherent in the nature of the business or mode of operation," or that it was created by the land occupier); Ingersoll v. DeBartolo, Inc., 123 Wn.2d 649, 652, 869 P.2d 1014 (1994) ("had, or should have had, knowledge of the dangerous condition in time to remedy the situation before the injury or to warn the plaintiff of the danger"); Falconer v. Safeway Stores, Inc., 49 Wn.2d 478, 480, 303 P.2d 294 (1956) ("One is presumed to know what one does").

[36]Iwai, 129 Wn.2d 84; 915 P.2d at 1095-96; Pimentel v. Roundup Co., 100 Wn.2d 39, 49, 666 P.2d 888 (1983); Falconer, 49 Wn.2d at 479-80; Trueax v. Ernst Home Center, Inc., 70 Wn. App. 381, 387-88, 853 P.2d 491 (1993), rev'd on other grounds, 124 Wn.2d 334 (1994); 6 WPI § 120.06.02 (cmt.) at 613-14.

[37]Iwai, 129 Wn.2d 84; 915 P.2d at 1097; Ingersoll, 123 Wn.2d at 652; Morton v. Lee, 75 Wn.2d 393, 397, 450 P.2d 957 (1969); Presnell v. Safeway Stores, Inc., 60 Wn.2d 671, 673, 374 P.2d 939 (1962); Coleman v. Ernst Home Center, Inc., 70 Wn. App. 213, 224, 853 P.2d 473 (1993).

[38]See Christen v. Lee, 113 Wn.2d 479, 497, 780 P.2d 1307 (1989) (drinking establishment's "duty to properly supervise its premises"); Manzanares v. Playhouse Corp., 25 Wn. App. 905, 908, 611 P.2d 797 (1980) (drinking establishment's duty of "reasonable care and vigilance"); Kelly v. Navy Yard Route, 77 Wash. 148, 150, 137 Pac. 444 (1913) (common carrier's duty to be "vigilant").

[39]See Christen, 113 Wn.2d at 504-06; Moore v. Mayfair Tavern, Inc., 75 Wn.2d 401, 405-06, 451 P.2d 669 (1969); Miller v. Staton, 58 Wn.2d 879, 883, 365 P.2d 333 (1961); Passovoy, 52 Wn. App. at 172-73 (duty to warn).

words, the duty to intervene arises only when a reasonable person acting under the same circumstances as the defendant would perceive that unreasonable conduct by a third person is impending or occurring, and thus that there is an unreasonable risk of harm to invitees.[40]

In this case, we are concerned with § 344, as opposed to §§ 343-343A. Nivens argues that the store failed to control the activities of third parties, i.e., the loitering teens. He does not argue, nor could he argue, that the store failed to deal with an unreasonably hazardous physical condition.

In applying § 344, we are concerned with the duty to intervene, as opposed to the duty to observe. Nivens does not contend that the store failed to observe the teens; indeed, it is obvious that the store's employees did observe the teens, both on the night in question and on many previous occasions. Nivens' key contention is that the store should have intervened in the teens' conduct at a time prior to when he was assaulted.[41]

Based on the above analysis of an occupier's duties, we hold that § 344's duty to intervene is owed by those occupiers of land who hold their premises open to the public—but only if a reasonable person in the occupier's circumstances would foresee that third-party conduct is creating an unreasonable risk of harm to invitees. In other words, the duty to intervene is subject to a preliminary condition of fact, i.e., the foreseeability of harm,[42] and the obligated class is *not* comprised of all occupiers who hold their land open to the public. Rather, the obligated class

---

[40]*See Christen*, 113 Wn.2d at 505-07; *Shelby v. Keck*, 85 Wn.2d 911, 914-15, 541 P.2d 365 (1975); *Miller*, 58 Wn.2d at 883; *Passovoy*, 52 Wn. App. at 172; *Manzanares*, 25 Wn. App. at 908-09.

[41]As noted already, Nivens' specific contention on appeal is that the store, months or years before he was assaulted, should have hired security guards to prevent teen loitering. In our view, however, it is necessary to establish that the store had a duty to intervene before considering the means—e.g., security guards—by which intervention should have been accomplished. Thus, we treat Nivens' contention as an assertion that the store had a duty to intervene.

[42]Incidentally, foreseeability plays a different role here than it did in *Schooley v. Pinch's Deli, supra*. Here, foreseeability is a limitation on the *obligated* class. In *Schooley*, foreseeability was a limitation on the *protected* class.

is comprised of those occupiers who (1) hold their land open to the public and (2) should foresee, in the exercise of reasonable care, that third-party conduct is creating an unreasonable risk of harm to invitees.[43]

## II. BREACH

■ ■ Breach mirrors duty. To prove breach, a plaintiff must show that (1) the defendant is a member of the obligated class; (2) that the plaintiff is a member of the protected class; and (3) that the defendant failed to comply with the standard of care. Except when reasonable minds could not differ, each of these questions is a question of fact for the jury.[44]

■ The question here is whether Nivens can bring the store within the obligated class. To do this, he must prove that (1) that the store was open to the public and (2) that the store should have foreseen, before the assault, that third-party conduct, i.e., teen loitering, was creating an unreasonable risk of harm to invitees. It is undisputed that the store was open to the public, so we focus on what the store should have foreseen. In doing that, we view the evidence and reasonable inferences therefrom in the light most favorable to Nivens.[45] Then, we ask whether a rational trier of fact could find, by a preponderance of the evidence, that a reasonable person in the store's position, before the assault on Nivens commenced, would have foreseen third-party conduct in the general nature of violence directed at one or more of the store's invitees. If the answer to the question is no, the store did not owe a duty to intervene (i.e., to disperse the teenagers, whether by security guards or other means), and the trial court's dismissal should be affirmed.

Several cases illustrate when a rational trier of fact

---

[43]*Shelby*, 85 Wn.2d at 914-15; *Passovoy*, 52 Wn. App. at 172.

[44]*Schooley*, 80 Wn. App. at 874.

[45]*Barr v. Day*, 124 Wn.2d 318, 324, 879 P.2d 912 (1994); *Hansen*, 118 Wn.2d at 485.

could *not* find, by a preponderance of evidence, that a reasonable person would foresee criminal conduct on the part of a third person. In *Christen v. Lee*,[46] the plaintiff was a patron in a public drinking establishment called the China Doll. Near closing time, he was accosted by three other patrons, including a man named Visitacion. Visitacion brandished a gun and told the plaintiff to " 'get the hell out of here.' "[47] Christen started to leave, but Visitacion shot him anyway. A security guard was present on the premises but did not intervene; later, he said he had been unaware of the confrontation.

Visitacion was a regular customer at the China Doll. Two of its employees suspected that he carried a gun, but on the night in question neither intervened. On previous occasions, a third employee had held Visitacion's gun in her purse while he drank. On the night in question, she no longer worked at the bar, but she was present as a customer. As before, she held Visitacion's gun in her purse, but returned it to him when she thought he was going home.

Christen sued the bar and the security company for negligence. The superior court granted summary judgment for the defendants, and Christen appealed to the Supreme Court. Holding that a drinking establishment may be held liable for a criminal assault by one of its patrons, but only when the assault is "reasonably foreseeable,"[48] the Supreme Court ruled that a public establishment owes no duty to intervene in third-party conduct on behalf of an invitee until a reasonable person in its position would foresee an attack. Additionally, the court ruled, as a matter of law, that a reasonable person would not foresee an attack unless he or she has "notice of the possibility of harm from prior actions of the person causing the injury, either on the occasion of the injury or on previ-

---

[46]*Christen*, 113 Wn.2d 479.

[47]*Christen*, 113 Wn. 2d at 483.

[48]*Christen*, 113 Wn.2d at 505.

ous occasions."[49] Noting that "[n]othing in the record suggests that Visitacion had ever exhibited any vicious propensities while at the China Doll, including on the night in question, until the confrontation which is asserted to have occurred in the lobby when the bar was closing,"[50] the court concluded that neither the China Doll nor the security company could be liable for inaction before the confrontation commenced, and that the superior court's dismissal of that part of the case had been correct.[51]

In *Getson v. Edifice Lounge, Inc.*,[52] cited and relied on in *Christen*,[53] the plaintiff was drinking at a tavern. Several members of a motorcycle gang known as the "Outlaws" were also present. At least two, and perhaps several, were wearing knives on their belts. One, Talmadge, was carrying a buck knife which, according to the court, "had a blade about 5 inches long and several inches wide."[54] The gang had not caused trouble on prior occasions, but on the night in question, Talmadge and the plaintiff became involved in a disagreement, after which Talmadge stabbed the plaintiff. The plaintiff sued the bar, asserting "that the fact there were knife[-]carrying 'Outlaws' in the bar gave the owner notice that someone was going to get hurt at the hands of those 'Outlaws.' "[55] The plaintiff obtained a jury verdict in his favor, but the appellate court reversed. Noting that the attack had to be reasonably foreseeable in order for the plaintiff to prevail, the court stated:

---

[49]*Christen,* 113 Wn.2d at 491, 498.

[50]*Christen*, 113 Wn.2d at 484.

[51]The Supreme Court ruled, however, that the trial court had erred by dismissing Christen's allegations insofar as they were based on inaction *after* the confrontation had commenced. 113 Wn.2d at 504-07; *see also Miller,* 58 Wn.2d at 883. That part of *Christen* is not in issue here, for Nivens does not contend that the store in this case failed to exercise reasonable care once the assault had begun.

[52]117 Ill. App. 3d, 453 N.E.2d 131 (1983).

[53]113 Wn.2d at 498-99.

[54]*Getson*, 453 N.E.2d at 133.

[55]*Getson*, 453 N.E.2d at 134.

We cannot say as a matter of law that someone who is a member of a motorcycle group and who happens to carry a buck knife is *per se* dangerous. There must be evidence of actions of Talmadge of which [the bar manager] was aware, or should have been aware, which would have compelled a reasonably prudent person to conclude that it was likely Talmadge might endanger an invitee.[56]

Like the *Christen* court, the *Getson* court essentially held that the plaintiff had failed to produce evidence sufficient to support a finding that a reasonable person would have foreseen an attack of the sort that took place.

In *Welch v. Railroad Crossing, Inc.*,[57] also cited and relied on in *Christen*,[58] the plaintiff was again drinking at a tavern. Also present was a man named Lovell. Lovell had frequented the tavern at least ten times without incident, although he looked "somewhat out of place . . . due to the tattoos on his arms, the leather cap he wore, and the pocketknife he wore in a carrier on his belt . . . ."[59] On the night in question, Lovell was served by the tavern even after he was visibly intoxicated. When the plaintiff went outside to her car, Lovell followed and stabbed her. She sued the tavern, but the trial court directed a verdict in the tavern's favor. Affirming, the appellate court stated that:

on the night in question, Lovell exhibited *no behavior* that suggested he was likely to use the knife as he did; he did not remove the knife from its carrier while in the bar and he made no threats to anyone. Moreover, Lovell had been in the Railroad Crossing many times, but had never exhibited any violent tendencies. . . . In short, Lovell's assault was as

---

[56]*Getson*, 453 N.E.2d at 135.

[57]488 N.E.2d 383 (Ind. Ct. App. 1986).

[58]113 Wn.2d at 499.

[59]*Welch*, 488 N.E.2d at 386.

unforeseeable, unexpected, and spontaneous as it was bar-baric.[60]

Like the *Christen* and *Getson* courts, the Welch court essentially held that the plaintiff had failed to produce evidence sufficient to support a finding that a reasonable person would have foreseen an attack of the general kind that took place.

In *Shelby v. Keck*,[61] Keck was asked to leave Myhre's cocktail lounge because he was carrying a gun. Three weeks later, he returned. He was again carrying a gun, but it was concealed in a shoulder holster and none of the bar's employees were aware of its presence. After accumulating a .16 blood alcohol reading, he tried to unload the gun while holding it under the table. In doing that, he unintentionally discharged a bullet, which struck and killed another patron, Shelby. Shelby's widow sued the bar, but the trial court dismissed her complaint as a matter of law. On appeal, the Supreme Court stated that a drinking establishment owes a duty of reasonable care "in only those instances where the threat of harm [is] *reasonably foreseeable.*"[62] It held, in effect, that a rational trier could not find that a reasonable person in Myhre's shoes would have foreseen an unreasonable risk of harm from Keck. Accordingly, it affirmed the trial court's judgment of dismissal.

In *Jones v. Leon*,[63] Vicki Binder was dating Glynn Bird. In February, she was slapped by Bird while they were at a drinking establishment called the Desert Inn. Two weeks later, on March 6, she told Bird that she no longer wanted to continue their relationship. The same evening, she went to the Desert Inn, where she was a regular customer, and told the manager that Bird had previously threatened her

---

[60]*Welch*, 488 N.E.2d at 389.

[61]85 Wn.2d 911.

[62]*Shelby*, 85 Wn.2d at 915.

[63]3 Wn. App. 916, 478 P.2d 778 (1970), *review denied*, 78 Wn.2d 997 (1971).

with death if she stopped seeing him; that she "imagined" Bird would kill her; and that the manager should call the police if Bird was seen. Less than an hour later, Binder was dancing with a man named Jones when Bird came in through the back door. Approaching Binder and Jones, Bird told Jones to leave, Binder told him he did not have to, and Jones elected to stay. Bird then pulled a gun and shot Jones.

Jones sued the Desert Inn for negligence, but the trial court dismissed his complaint as a matter of law. Jones appealed, arguing that a reasonable person in the Inn's shoes would have foreseen violence by Bird against invitees due to the February slapping incident, and also due to Binder's statements to the manager on the evening of the shooting. Thus, Jones argued, as Nivens does here, that the Desert Inn "had the duty to immediately—or at least within the hour—take preventive measures, to wit, require Vicki to leave the premises, or post guards to prevent the entry of Glynn Bird";[64] and thus that the Desert Inn could be held liable for its failure to take action *before the shooting incident began.* Viewing the evidence in the light most favorable to Jones, Division Three held, in effect, that a rational trier of fact could not find that a reasonable person would have foreseen violence of the general type that Bird perpetrated. As a result, the trial court had acted properly by dismissing the complaint as a matter of law.

■■■■ Uniformly, these cases teach that a rational trier could not find, based on loitering without more, that a reasonable person would foresee violence against an occupier's invitees. Indeed, the cases seem to say this is true even where the loiterer is drinking heavily and carrying a weapon.

In this case, there is a dearth of evidence that any of the loitering teenagers engaged in or threatened violence toward an invitee on any occasion before the incident in

---

[64]*Jones*, 3 Wn. App. at 926.

question. There is a dearth of evidence that any of the loitering teens had engaged in or threatened violence toward anyone at all, except for isolated instances of fisticuffs among themselves. There is a dearth of evidence that any of the loitering teens had violent propensities, or, if they did, that the store knew of the same. In sum, there is a dearth of evidence to support a finding that a reasonable person would have foreseen violence of the general type that occurred here, and neither the evidence nor inferences therefrom are sufficient to bring the store within the obligated class.

We do not overlook Nivens' reliance on *Passavoy v. Nordstrom, Inc..*[65] There, three department store detectives apprehended two shoplifters inside the store. One of the shoplifters bolted, and one of the detectives gave chase through the store. The shoplifter was caught, but not before he knocked one customer down some stairs and left another customer "slumped over the stair railing."[66] The customers sued the store for negligence, but the trial court granted summary judgment to the store. Division One reversed, holding "that a material issue of fact exists concerning whether the detective could have warned [the two customers] in time for them to protect themselves."[67]

The issue in *Passavoy* arose under RESTATEMENT § 344(b). It was whether the detectives could have "give[n] a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it." It was not whether an assault was impending or occurring, for an assault was obviously imminent once the detective started chasing the shoplifter through the store. In contrast, the issue in this case arises under RESTATEMENT § 344(a). It is whether the store knew or should have known that an assault was imminent. For these reasons, *Passavoy* is of no help here.

Nivens also relies on *Hutchins v. 1001 Fourth Ave. As-*

[65]52 Wn. App. 166.

[66]*Passavoy*, 52 Wn. App. at 168.

[67]*Passavoy*, 52 Wn. App. at 173.

*socs.*[68] That case did not involve land held open to the public. Nor did it involve an invitee. For both reasons, it is of no help here.

Finally, Nivens relies on *McLeod v. Grant County Sch. Dist. No. 128,*[69] a case involving a school district's duty to supervise its students, and *Petersen v. State,*[70] a case involving a hospital's duty to supervise its patients. Citing *Lauritzen,*[71] he also notes, correctly, that relationships deemed "special" for purposes of tort law include, at least on occasion, the school-student relationship; the hotel-guest relationship; the hospital-patient relationship; the employer-employee relationship; and the store-customer relationship.[72]

In our view, the stated relationships fall into at least two groups. In one group are relationships that are both custodial and protective, such as the school-student relationship and the hospital-patient relationship. In another group are relationships that are protective but not custodial, such as the hotel-guest relationship and the store-customer relationship. In the first group, one party is typically incapacitated, as for example by immaturity or illness. In the other, each party is typically a fully functioning adult. Although it may be appropriate to analogize among relationships within the same group, we do not think it appropriate to analogize relationships in one group to those in the other, at least in the usual case. In general, then, we decline to use school-student or hospital-patient cases when analyzing the liability of a store.

In conclusion, the store owed Nivens a duty of reasonable care to protect him from the loitering teens if, but only if, a reasonable person in the store's shoes would

[68]116 Wn.2d 217.

[69]42 Wn.2d 316, 255 P.2d 360 (1953).

[70]100 Wn.2d 421.

[71]74 Wn. App. at 439.

[72]*See* KEETON § 56 at 383.

have foreseen that the loitering teens presented an unreasonable risk of harm to invitees. Even when the evidence is viewed in the light most favorable to Nivens, a rational trier could not so find. Thus, the trial court did not err when it dismissed the complaint with prejudice.

Affirmed.

SEINFELD, C.J., and CONOLEY, J. Pro Tem., concur.

Review granted at 131 Wn.2d 1005 (1997).