[No. 14363-1-II.    Division Two.    November 22, 1993.]

JOHN A. EIFLER, JR., *Appellant,* v. SHURGARD CAPITAL
MANAGEMENT CORPORATION, *Respondent.*

*John W. Sweet,* for appellant.

*Thomas R. Merrick, Robert J. Roche,* and *Bullivant, Houser, Bailey, Pendergrass & Hoffman,* for respondent.

MORGAN, J. — After John Eifler's car disappeared while stored at Bremerton Shurgard Self Storage, he sued for breach of contract, negligence, and violation of the Consumer Protection Act (CPA). We affirm the dismissal of his claims for breach of contract and negligence, but reverse and remand for trial on his CPA claim.

Bremerton Shurgard Self Storage (Bremerton Shurgard) is owned and operated by Shurgard Capital Management Corporation. In May 1988, its resident managers were Vi and Ed Reinhart.

Eifler is a sailor whose job takes him to sea for months at a time. While he is gone, he needs a place to store his belongings.

In 1986, Eifler leased interior space at Bremerton Shurgard. In May 1988, he leased additional outside space, because he needed a place to store his car.

In May 1988, Eifler signed a written lease. It provided in part:

3. TENANT RESPONSIBLE. Tenant acknowledges and understands that no bailment is created by this lease, that landlord is not engaged in the business of storing goods for hire nor in the warehousing business, but is simply a landlord renting the Storage Unit in which Tenant can store items of personal property owned by Tenant. The Storage Unit is under the exclusive control of Tenant. Landlord does not take custody, control, possession or dominion over the contents of the Storage Unit, and does not agree to provide protection for the Self-Storage Facility, Storage Unit, or its contents thereof.

ALL PERSONAL PROPERTY ON OR IN THE STORAGE UNIT IS AT THE RISK OF TENANT. Tenant must take whatever steps are necessary to safeguard whatever property is stored in the Storage Unit. . . .

Landlord does not have any obligation to carry insurance on tenant's property stored in the Storage Unit. IF TENANT WISHES TO HAVE HIS PROPERTY COVERED BY INSURANCE, TENANT MUST OBTAIN SEPARATE COVERAGE. Landlord will not be responsible or otherwise liable, directly or indirectly, for loss or damage to the property of Tenant due to any cause, including fire, explosion, theft, vandalism, wind or water damage, any defect now, or subsequently created or discovered, in the Storage Unit, or acts or omissions of any third party, regardless of whether such loss or damage may be caused or contributed to by the negligence of Landlord, its agents or employees.

The lease also contained an addendum relating to insurance. It stated that Eifler could obtain insurance from his own insurance agent or from Shurgard, or that he could elect to be self-insured. Eifler chose to be self-insured.

When Eifler leased the additional, outside space for his car, the Reinharts asked that he leave a set of car keys with them while he was out at sea. They were trying to convince a truck rental company to park its trucks at Bremerton Shurgard, and if the deal went through, his car might have to be moved to another part of the premises. Honoring the request, Eifler left a set of keys.

During the remainder of 1988, Eifler used his car on a number of occasions while on shore leave. After each use, he returned the car to its outside storage space. The car was in

its outside storage space when he last saw it on December 10, 1988.

On February 25, 1989, Eifler returned to Bremerton Shurgard and could not find his car. He then sought out and spoke with Mark Bourgeois, the new resident manager. Bourgeois said he knew nothing about the whereabouts of the car or the set of keys. He said Vi Reinhart had died, and Ed Reinhart had left the previous November. He said that Bremerton Shurgard had not had a resident manager since November, though it had had daytime managers since that time. Eifler canceled his lease on the last day of February 1989.

In August 1989, Eifler sued, alleging breach of contract, negligence, restitution, and violation of the Consumer Protection Act. The case was referred to mandatory arbitration, where Eifler lost. He then demanded trial de novo under MAR 7.1.

A jury trial was held July 17-20, 1990. Shurgard's assistant manager testified that he had discovered a large hole cut in the fence near Eifler's outside storage space about a month before the car was discovered missing. Apparently, however, the hole was soon fixed. Ed Reinhart testified the fence was easily breached because of its weak construction. Reinhart also testified he had informed his superiors of the problem, but they had done nothing to correct it. Reinhart also confirmed that he had had possession of a set of keys for Eifler's car.

Eifler himself testified that in 1986, when he had needed a place to store his belongings, he looked in the yellow pages and noticed an advertisement for Bremerton Shurgard Self Storage. The advertisement declared, "We Have Safe Storage All Locked Up". It went on to proclaim that Bremerton Shurgard was "fenced and lighted", with a "resident manager" and "electronic security and gates". He thought the facility "sounded safe".

After Eifler had presented his case, Shurgard moved for directed verdict. The trial court granted the motion as to the CPA claim, but denied it as to the contract and negligence claims.

Shurgard rested without presenting evidence. It then renewed its motion for directed verdict on the contract and negligence claims. It argued that the lease precluded liability for ordinary negligence, and that there was no evidence of gross negligence.

The trial court granted the motion on grounds that Shurgard had effectively limited its liability for ordinary negligence by means of the lease. The trial court submitted the issue of gross negligence to the jury, which found that Shurgard had not acted with gross negligence.

After trial, the court awarded Shurgard costs and reasonable attorney fees in the amount of $10,011.50. The reasonable attorney fees were those "incurred following the date plaintiff filed his request for a trial de novo."[1] *See* MAR 7.3.

## I
### BREACH OF CONTRACT AND NEGLIGENCE

Eifler argues that the trial court erred in directing a verdict on his claims for breach of contract and negligence. He says the lease was ineffective to limit Shurgard's liability for negligence because he and Shurgard had a bailment relationship, and a bailee cannot limit its liability for negligence. We address (A) whether there was a bailment relationship and (B) if so, whether Shurgard effectively limited its liability for negligence.

### A

A bailment " 'arises generally when personalty is delivered to another for some particular purpose with an express or implied contract to redeliver when the purpose has been fulfilled' ". *Gingrich v. Unigard Sec. Ins. Co.,* 57 Wn. App. 424, 431-32, 788 P.2d 1096 (1990) (quoting *Freeman v. Metro Transmission, Inc.,* 12 Wn. App. 930, 932, 533 P.2d 130 (1975)). There can be no bailment without "a change of possession and an assumption or acceptance of possession by the person claimed to be a bailee." *Freeman,* 12 Wn. App. at 932 (quoting *Collins v. Boeing Co.,* 4 Wn. App. 705, 711, 483 P.2d 1282, 46 A.L.R.3d 1294 (1971)); *see also Theobald v.*

---

[1]Clerk's Papers, at 155.

*Satterthwaite,* 30 Wn.2d 92, 94, 190 P.2d 714, 1 A.L.R.2d 799 (1948).

■ In this case, a bailment was not created simply because Eifler left his car on Shurgard's premises. He leased space from Shurgard, but by that fact alone, he did not deliver or transfer possession of the car. On the contrary, he continued to take the car in and out of Shurgard's premises at will, and without notice to Shurgard.[2]

However, a bailment was created when Eifler left his car keys with Vi and Ed Reinhart. By doing that, he impliedly authorized them to move the car around the premises. This was a transfer of possession, and it was accepted by Shurgard, acting through the resident managers.

### B

Generally, a party to a contract can limit liability for damages resulting from negligence. *American Nursery Prods., Inc. v. Indian Wells Orchards,* 115 Wn.2d 217, 230, 797 P.2d 477 (1990). The extent to which a nongratuitous bailee can do this, however, varies according to the nature of the bailment.

■ A nongratuitous bailment can be a bailment for mutual benefit. *American Nursery,* 115 Wn.2d at 232. A bailment for mutual benefit arises

> when both parties to the contract receive a benefit flowing from the bailment. 8 C.J.S. *Bailments* § 16 (1988). The benefit to the bailee need not be in the form of cash. Rather, the benefit may derive from
>> a bailment [which] is a mere incident to the performance of services for which the bailee receives compensation or to the conduct of business from which the bailee derives profit, or where the bailment is motivated by the bailor's desire to promote a sale . . ..

*American Nursery,* 115 Wn.2d at 232 (quoting 8 C.J.S. *Bailments* § 16, at 239 (1988)); *see also White v. Burke,* 31 Wn.2d 573, 583, 197 P.2d 1008 (1948).

---

[2]Incidentally, this result is consistent with *Sackett v. Public Storage Mgt.,* 222 Cal. App. 3d 1088, 1093, 272 Cal. Rptr. 284, 287 (1990). There, the act of the landlord in putting an emergency lock on a renter's storage unit did not create a bailment. Rather, the court said, it merely "represents a simple extension of courtesy to its customers and is totally different than the unequivocal assumption of control of the bailed items found so important in [the bailment cases]."

A bailment for mutual benefit can also be a professional bailment. *American Nursery,* 115 Wn.2d at 232. A professional bailee is one (1) whose principal business is to act as bailee, and (2) who deals with the public on a uniform rather than individual basis. *American Nursery,* 115 Wn.2d at 231; 8 Am. Jur. 2d *Bailments* § 145 (1980). Examples include the public warehouse, the parcel checkroom, and the parking garage or parking lot in which the attendant is given the right to move the car around the premises. W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 68, at 482-83 (5th ed. 1984); *Wagenblast v. Odessa Sch. Dist. 105-157-166J,* 110 Wn.2d 845, 758 P.2d 968, 85 A.L.R.4th 331 (1988); 8 Am. Jur. 2d *Bailments* § 145 (1980).

■ ■ When a bailment for mutual benefit is not also a professional bailment, public policy may or may not permit the bailee to limit his or her liability for negligence. *American Nursery,* 115 Wn.2d at 232. The controlling factors are set forth in *Wagenblast. American Nursery,* 115 Wn.2d at 232-33. As the *Wagenblast* court said:

> Probably the best exposition of the test to be applied in determining whether exculpatory agreements violate public policy is that stated by the California Supreme Court. In writing for a unanimous court, the late Justice Tobriner outlined the factors in *Tunkl v. Regents of Univ. of Cal.,* 60 Cal. 2d 92, 383 P.2d 441, 32 Cal. Rptr. 33, 6 A.L.R.3d 693 (1963):
>
> > Thus the attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the

purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

(Footnotes omitted.) *Tunkl,* 60 Cal. 2d at 98-101. We agree.

Obviously, the more of the foregoing six characteristics that appear in a given exculpatory agreement case, the more likely the agreement is to be declared invalid on public policy grounds.

(Footnotes omitted.) *Wagenblast,* 110 Wn.2d at 851-52 (quoting *Tunkl v. Regents of Univ. of Cal.,* 60 Cal. 2d 92, 98-101, 383 P.2d 441, 32 Cal. Rptr. 33, 6 A.L.R.3d 693 (1963)).

When a bailment for mutual benefit is also a professional bailment, public policy will not permit the bailee to limit his or her liability for negligence. *American Nursery,* 115 Wn.2d at 230 (citing *Wagenblast,* 110 Wn.2d at 849).[3] As stated in *American Nursery:*

> the equality of bargaining power of the two parties to the [professional bailment] contract is largely theoretical in nature while actually the bailor, being in need of the services to be rendered by the bailee and usually being in no position to take his trade elsewhere, is compelled to agree to the terms stipulated by the bailee.

*American Nursery,* 115 Wn.2d at 231 (quoting Annot., *Liability of Garagemen for Theft or Unauthorized Use of Motor Vehicle,* 43 A.L.R.2d 403, 419 n.2 (1955)); *see also Griffin v. Nationwide Moving & Storage Co.,* 187 Conn. 405, 416, 446 A.2d 799, 805 (1982) (" 'professional' bailees impose predetermined conditions upon bailors whose bargaining power lacks parity with such bailees"); *Central Transp., Inc. v. Great Dane Trailers, Inc.,* 423 N.E.2d 675, 678 (Ind. Ct. App. 1981); Restatement (Second) of Torts § 496B, comment *g* (1965); Annot., *Liability for Loss of or Damage to Automobile Left in Parking Lot or Garage,* 7 A.L.R.3d 927, 938 (1966).

---

[3]*Central Transp., Inc. v. Great Dane Trailers, Inc.,* 423 N.E.2d 675, 678 (Ind. Ct. App. 1981); *see* Restatement (Second) of Torts § 496B, comment *g* (1965) (where the defendant is a common carrier, an innkeeper, a public warehouseman, a public utility, or is otherwise charged with a duty of public service, and the agreement to assume the risk relates to the defendant's performance of any part of that duty, it is well settled that it will not be given effect. Having undertaken the duty to the public, which includes the obligation of reasonable care, such defendants are not free to rid themselves of their public obligation by contract, or by any other agreement); Annot., *Liability for Loss of or Damage to Automobile Left in Parking Lot or Garage,* 7 A.L.R.3d 927, 938 (1966).

The bailment created in this case was not a professional one. Generally, Shurgard leased storage space but did not acquire the right to possess property stored on the premises. For example, it could not generally move property from one storage locker to another, or from one part of the premises to another, as would be standard in a public warehouse. Shurgard's "principal business" was not that of bailee, and the bailment here did not satisfy the first element needed for a professional bailment.

This conclusion is fortified by the lease Eifler signed. It expressly notes that Shurgard is "*not* a warehouseman"; that Shurgard "*does not* take custody of my property"; and that Shurgard is "not engaged in the business of storing goods for hire nor in the warehousing business."

Although the bailment that was created was not a professional one, it was for mutual benefit. Eifler wanted to obtain space in which to store his car. Shurgard wanted to lease space and thereby obtain compensation. Delivering a set of car keys to the resident managers, thereby permitting them to possess and move the car, was "incident to the performance of services for which the bailee receives compensation or to the conduct of a business from which the bailee derives profit". *American Nursery*, 115 Wn.2d at 232 (quoting 8 C.J.S. *Bailments* § 16, at 239 (1988)). Under these circumstances, a bailment for mutual benefit arose.

The bailment being for mutual benefit, Shurgard's ability to limit its liability for negligence is controlled by the *Wagenblast* factors set forth above. In our view, the crucial factor in this case is that Shurgard repeatedly and emphatically offered Eifler the opportunity to purchase insurance from it or from his own insurance agent. The lease agreement that Eifler signed in May 1988 said in big, bold letters, "All personal property on or in the storage unit is at the risk of tenant." It also said, "Landlord does not have any obligation to carry insurance on tenant's property stored in the Storage Unit", and "If tenant wishes to have his property covered by insurance, tenant must obtain separate coverage." The addendum Eifler signed at the same time said repeatedly, in large, bold

print, that Shurgard would not be responsible for loss to his property, that Shurgard was not providing insurance that would cover loss, and that he could purchase insurance from Shurgard or his own agent.[4] It also contained an application for insurance. It showed, apparently in Eifler's own hand, that he chose not to purchase insurance, and that part of the form constituting an application for insurance was left blank. Under these circumstances, we do not perceive a contract of adhesion whereby Eifler was deprived of a fair opportunity to protect the value of his property, and we hold that Shurgard was not precluded from limiting its liability for negligence in the way that it did.

In reaching this result, we do not overlook the other *Wagenblast* factors, *i.e.,* that Shurgard was regulated to some degree by RCW 19.150; that it was open to the public; and that some members of the public may have a practical need to use self-storage facilities. Nevertheless, we think that these factors are substantially outweighed by the fact that Shurgard provided Eifler with a reasonable and fair opportunity to decide whether he wished to insure his own property against loss.

We conclude there was a bailment; that it was for mutual benefit; and that according to the *Wagenblast* factors, Shurgard was not precluded from limiting its liability for ordinary negligence. Therefore, the trial court did not err in directing a verdict on Eifler's claims for breach of contract and ordinary negligence.

## II
### RESTITUTION

Eifler argues that he is entitled to a refund of payments attributable to the period after his car disappeared.[5] This is

---

[4]These provisions went well beyond the requirements of the Washington self-service storage facility act. That act states:

"Any insurance protecting the personal property stored within the storage space against fire, theft, or damage is the responsibility of the occupant. The owner is under no obligation to provide insurance." RCW 19.150.130.

[5]Only a few dollars are involved, but the matter may have significance because Shurgard is entitled to reasonable attorney fees if Eifler fails to improve his position after demanding trial de novo. MAR 7.3.

true, he says, because neither he nor Shurgard knew his car was gone when he made such payments, and thus the payments were made under a mutual mistake of fact. We discuss the December, January and February payments separately from the March payment.

### A

█ Although money paid under mutual mistake can be recovered, *Pacific Coal & Lumber Co. v. Pierce Cy.,* 133 Wash. 278, 279-80, 233 P. 953 (1925); *Loeb Rhoades, Hornblower & Co. v. Keene,* 28 Wn. App. 499, 500, 624 P.2d 742 (1981), the payer has the burden of proving each element necessary to his or her cause of action. *Clark v. Luepke,* 60 Wn. App. 848, 851, 809 P.2d 752 (1991). Here, then, Eifler must produce evidence sufficient to support a finding that his car disappeared before the date on which he made his December, January and February lease payments.

At trial, there was evidence that Eifler's car disappeared between December 10 and February 25. However, there was no evidence showing when within that period it disappeared. Without at least slight evidence as to when the car disappeared, a reasonable juror could not have found by a preponderance of evidence that the car was taken either before or after Eifler made his December, January and February payments. Thus, the evidence was insufficient to support a verdict that the car was taken before the date on which those payments were made, and the trial court did not err in failing to submit to the jury Eifler's claim for a refund.

### B

█ Eifler also seems to contend he should have received a refund of money paid for March 1989. However, Shurgard credited that payment to rental owed on the interior space that Eifler was leasing for personal property other than the car. There is no evidence that Eifler[6] directed Shurgard to

---

[6]Actually, the March payment was made by Eifler's mother on his behalf, but neither is there any evidence that she directed Shurgard to apply the payment to rental on the outside rather than the inside space.

apply the March payment to the outside rather than the inside space, so Shurgard was entitled to credit the payment as it did. *Oakes Logging, Inc. v. Green Crow, Inc.,* 66 Wn. App. 598, 601, 832 P.2d 894 (1992).

## III
### CONSUMER PROTECTION ACT

■ ■ Eifler claims the trial court erred in directing a verdict on his CPA claim. A directed verdict is appropriate if, viewing the evidence in the light most favorable to the non-moving party, the evidence is insufficient to support one or more facts needed to establish the cause of action. *Hizey v. Carpenter,* 119 Wn.2d 251, 271-72, 830 P.2d 646 (1992) (citing *Industrial Indem. Co. of Northwest, Inc. v. Kallevig,* 114 Wn.2d 907, 915-16, 792 P.2d 520, 7 A.L.R.5th 1014 (1990)). The elements needed to establish a CPA cause of action are (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.,* 105 Wn.2d 778, 780, 719 P.2d 531 (1986).

Here, the evidence was sufficient to support an inference that Bremerton Shurgard engaged in an act or practice designed to make the public think that it operated a safe storage facility. Shurgard placed a yellow pages advertisement stating, "We Have Safe Storage All Locked Up". It proclaimed in the same ad that it was "fenced and lighted", with a "resident manager" and "electronic security and gates". In a separate flier, it stated, "Shurgard managers live right on site", "making sure everything is *safe* and *secure*". In another flier, it displayed a picture of a padlock with the Shurgard trademark emblazoned upon it. And last but not least, the name "Shurgard" is obviously meant to imply a degree of diligence and security.

The evidence was sufficient to support an inference that these acts or practices were unfair or deceptive. Resident managers were not on site from November 1988 to February 1989. According to Ed Reinhart, the facility's fence was weakly con-

structed and easily breached, and his superiors, after being so informed, had not corrected the problem. In at least one instance, the security computer system on the gate may not have been operable.

The evidence was sufficient to support an inference that the unfair or deceptive act or practice occurred in the course of trade or commerce. Shurgard was engaged in trade or commerce at all material times.

■ The evidence was sufficient to support an inference that the unfair or deceptive act or practice affected the public interest. An act or practice affects the "public interest impact", when (1) it is part of a pattern or generalized course of conduct, and (2) there is a real and substantial potential for repetition of defendant's conduct after the act involving plaintiff. *Hangman*, 105 Wn.2d at 790; *Travis v. Washington Horse Breeders Ass'n*, 111 Wn.2d 396, 407, 759 P.2d 418 (1988). Here, Shurgard disseminated to the entire public its company name, its yellow pages advertisement, and its fliers. All were part of a generalized course of conduct, and all were capable of repetition with respect to numerous members of the public.

■ Finally, the evidence was sufficient to support an inference that Eifler was injured "in his or her business or property" and that Shurgard's acts or practices were a proximate cause of the injury. Eifler testified that he chose to store his belongings at Shurgard because he thought the facility, due to its distinctive name and advertised qualities, "sounded safe". It is inferable from the evidence at trial, however, that it was less safe than the name, advertisements and brochures made it appear, and that that fact was a proximate cause of injury to Eifler's property. Because there was evidence sufficient to support each element of Eifler's CPA claim, that claim should not have been dismissed as a matter of law.

## IV
### COSTS AND ATTORNEY FEES

■ In awarding costs and reasonable attorney fees, the trial court relied in part on RCW 4.84.185, which provides

for reasonable attorney fees in a frivolous action. Whether or not this action has merit, it is not frivolous, and RCW 4.84-.185 may not be applied on remand.

The trial court also relied on MAR 7.3, which provides that the court may "assess costs and reasonable attorney fees against a party who appeals the [arbitration] award and fails to improve the party's position on the trial de novo." On remand, application of MAR 7.3 will depend on the outcome of Eifler's CPA claim.

Shurgard claims that its lease entitles it to costs and reasonable attorney fees. The lease provides:

> Tenant agrees to pay all costs and expenses, including attorneys fees and reasonable service fees, of Landlord in enforcing the terms of this lease.

This language might entitle Shurgard to costs and reasonable attorney fees if it were suing Eifler to enforce the lease.[7] However, it does not entitle Shurgard to costs and attorney fees where Eifler is suing Shurgard to enforce his rights under the common law and the CPA. In such a suit, the "landlord" is not incurring costs or expenses "in enforcing the terms of the lease", and the quoted language does not apply.

The judgment dismissing Eifler's claims for breach of contract, negligence, and restitution is affirmed. The judgment dismissing Eifler's CPA claim is reversed, and that claim is remanded for trial. The judgment awarding costs and reasonable attorney fees is vacated.

SEINFELD, A.C.J., and PETRICH, J. Pro Tem., concur.

---

[7] We note, however, that the quoted language does not refer to reasonable as opposed to statutory attorney fees.