28 P.3d 802 (2001)
107 Wash.App. 833
James BISHOP and Melody Bishop, husband and wife, Appellants,
v.
JEFFERSON TITLE COMPANY, INC., a Washington Corporation, Respondent.
No. 25202-3-II.
Court of Appeals of Washington, Division 2.
August 10, 2001.
*804 Lane J. Wolfley, Wolfley, Basden, Hansen, Port Angeles, for Appellants.
Alan Bradford Hughes, Alan B. Hughes, P.s., Seattle, for Respondent.
Kenneth Wendell Masters, Wiggins Law Office, Bainbridge, for Amicus Curiae Wash. State Bar Ass'n.
Paul Hieb, Chimacum, pro se.
*803 HUNT, J.
James and Melody Bishop appeal dismissal of their legal malpractice action against Jefferson Title Company. The Bishops claimed that Jefferson Title's Limited Practice Officer committed malpractice when she erroneously completed unauthorized form documents for two real estate transactions to which they were parties. The Bishops also appeal an attorney fee award to Jefferson Title and ask that we grant summary judgment in their favor. Holding that summary judgment and the attorney fee award to Jefferson Title were error, we reverse and remand for trial.

FACTS

I. LAND TRANSFERS

A. DECHANTAL'S PURCHASE OF 48 ACRES (TEN LOTS) AND ENCUMBRANCE OF 42 ACRES
Alain & Judith DeChantal (DeChantal) were real estate developers in Jefferson County. In 1990, DeChantal purchased 48 acres of land, comprising ten parcels, financed with a $205,000 development loan from Pacific Coast Investment Company. The loan was secured by a deed of trust for 42 acres of land, which was recorded April 30, 1990, under Jefferson County Auditor's file no. 330300.

B. DECHANTAL'S SALE TO BISHOP
James Bishop was a contractor who had worked exclusively for DeChantal's developments for many years. In 1991, DeChantal sold two parcels, together with non-exclusive easements,[1] to James and Melody Bishop *805 (Bishop). Bishop recorded the statutory warranty deed from DeChantal, which contained the following reservation:
Subject to: Deed of Trust recorded April 30, 1990 under auditor's file no. 330300 in favor of Pacific Coast Investment Company which the grantor herein agrees to continue to pay according to its terms, and to pay in full not later than the date on which the grantee's indebtedness to the grantor secured by the above-described real estate is fully paid and satisfied.
Clerk's Papers at 119. DeChantal apparently advanced $19,200 in credit to Bishop for the purchase.
As part of the transaction, Bishop recorded a deed of trust for both parcels in favor of DeChantal, securing repayment of this debt.[2] DeChantal and Bishop also signed Exhibit "B"[3] to the deed of trust ("Exhibit B"). "Exhibit B" provided further information concerning DeChantal's 1990 deed of trust to Pacific Coast Investment and Bishop's 1991 deed of trust to DeChantal. "Exhibit B" stated: "[The][b]eneficiary hereby agrees with the Grantor to discharge the First Note to the Holder thereof ... and to hold Grantor harmless from any liability in connection therewith." "Exhibit B" designated DeChantal as the beneficiary, Bishop as the grantor, and Pacific Coast as the first note holder.
Vicky Lockhart, the Limited Practice Officer (LPO) for escrow agent Jefferson Title, served as closing officer for DeChantal's land sale to Bishop. DeChantal transferred additional property in the development to Bishop by a quit claim deed.[4]

C. BISHOP'S SALE TO HIEB
In 1994, Bishop sold Paul Hieb six parcels of property along with appurtenant easements.[5] In an addendum to their purchase and sale agreement, Bishop and Hieb provided:
The deed of trust shall be an `all-inclusive' deed of trust, second to an underlying encumbrance with Pacific Coast Investment Company.
Clerk's Papers at 208. The escrow instructions stated:
[T]he undersigned have examined and hereby approve for use in this escrow the following documents as to content and form: Statutory Warranty Deed, Excise Tax Affidavit, Promissory Note and Deed of Trust.
Clerk's Papers at 209.
The 1994 Bishop-to-Hieb statutory warranty deed stated that it was "subject to" the 1990 DeChantal-to-Pacific Coast deed of trust. Critically, the deed stated that the "grantor herein" must "pay in full" the 1990 deed of trust between DeChantal and Pacific Coast:
SUBJECT TO: DEED OF TRUST RECORDED APRIL 20 [sic], 1990 UNDER AUDITOR'S FILE NO. 330300 AND ASSIGNMENTS THERETO WHICH THE GRANTOR HEREIN SHALL PAY ACCORDING TO ITS TERMS; AND PAY IN FULL NOT LATER THAN THE DATE ON WHICH THE GRANTEE'S INDEBTEDNESS TO THE GRANTOR SECURED BY THE ABOVE-DESCRIBED *806 REAL ESTATE IS FULLY PAID AND SATISFIED.
Clerk's Papers at 178. But Bishop, not DeChantal, was the grantor in the 1994 deed.
Hieb executed a deed of trust in favor of Bishop, securing payment of $65,712.50 that Hieb owed Bishop for the land. But "Exhibit B" to this deed of trust, "attached hereto and made a part" of the deed, utilized the same language, terminology, and party designations from "Exhibit B" to the 1991 DeChantal-Bishop deed of trust. The 1994 "Exhibit B" mentions both the 1994 deed of trust securing Hieb's $65,712.50 debt to Bishop and the 1990 deed of trust securing DeChantal's $205,000 debt to Pacific Coast (the "First Note"); it does not mention the 1991 deed of trust securing Bishop's $19,200 debt to DeChantal.
Bishop, Hieb, and DeChantal signed Exhibit B to the 1994 Hieb-Bishop deed of trust. Exhibit B required the beneficiary to pay the underlying first note:
Beneficiary hereby agrees with Grantor to discharge the First Note to the Holder thereof in accordance with the terms and conditions therein and to hold Grantor harmless from any liability in connection therewith.
Clerk's Papers at 193. But the 1994 Exhibit B does not identify the grantor or the beneficiary.[6] The 1994 deed of trust grantor is Paul Hieb, and Bishop is the beneficiary. Again, Vicky Lockhart, the LPO for Jefferson Title, served as closing officer for the Bishop-Hieb transaction.

D. HIEB PAYS BOTH HIS DEBT TO BISHOP AND DECHANTAL'S DEBT TO PACIFIC/OLYMPIC COAST
DeChantal defaulted on his debt to Pacific Coast's successor-in-interest, Olympic Coast Investment, and declared bankruptcy. In 1997, Olympic Coast commenced a trustee's sale of seven lots in DeChantal's development, including the two lots that DeChantal had sold to Bishop and that Bishop, in turn, had sold to HiebParcels II and VI, as well as Parcels VII and VIII (two of the three parcels originally quit-claimed from DeChantal to Bishop).[7] Hieb had paid off his obligation to Bishop for his parcels. Hieb also paid $54,000 of DeChantal's debt to Olympic Coast in order to obtain a partial release from the underlying deed of trust and to unencumber his parcels.

II. LAWSUITS
In May 1998, Hieb sued Bishop to recover the $54,000 he had paid on DeChantal's behalf, plus costs and attorney fees. Jefferson Title was joined as a third party defendant. The trial court severed the Hieb v. Bishop trial from the Bishop v. Jefferson Title Company trial.

A. HIEB V. BISHOP
In April 1999, following a trial on Hieb's claims against Bishop, the court entered Findings of Fact and Conclusions of Law. The trial court awarded Hieb $61,147.50 plus $6,969 in attorney fees, for a total judgment against Bishop of $67,116.50. Although this action is not part of the instant appeal, it provides the basis for the financial harm that Bishop suffered as a result of Jefferson Title's alleged negligence.

B. BISHOP V. JEFFERSON TITLE
Both Bishop and Jefferson Title moved for summary judgment. The trial court granted Jefferson Title's motion and denied Bishop's, ruling:
The several declarations filed by the two parties are, basically, declarations of individuals who would qualify as expert witness at trial. While these declarants reach differing conclusions, they do not create issues of material fact. The basic facts are not in dispute.
....
After review of all the declarations submitted by both parties, Admission to Practice Rule 12 (Limited Practice Rule For *807 Closing Officers), and the memoranda of counsel, it is this court's conclusion that as a matter of law there was neither a violation of the Consumer Protection Act nor legal malpractice on the part of Third Party Defendant Jefferson Title.
Clerk's Papers at 589-90. The trial court dismissed with prejudice all third-party claims against Jefferson Title and awarded it $26,876.55 in expenses, attorney fees and costs, "pursuant to written agreement."

ANALYSIS

I. SUMMARY JUDGMENTSTANDARD OF REVIEW
On a motion for summary judgment, the trial court must view all evidence and draw all reasonable inferences in favor of the nonmoving party; then it must deny the motion if the evidence and inferences create any question of material fact. Scott v. Pac. West Mountain Resort, 119 Wash.2d 484, 487, 834 P.2d 6 (1992). On appeal, we engage in the same inquiry as the trial court. DeYoung v. Providence Med. Ctr., 136 Wash.2d 136, 140, 960 P.2d 919 (1998); Benjamin v. Washington State Bar Ass'n, 138 Wash.2d 506, 515, 980 P.2d 742 (1999). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Kruse v. Hemp, 121 Wash.2d 715, 722, 853 P.2d 1373 (1993); CR 56(c). Applying this standard, we hold that the trial court erred in granting summary judgment to Jefferson Title on Bishop's malpractice and consumer protection claims.

II. LIMITED PRACTICE OF LAWAPR 12
Admission to Practice Rule (APR) 12 creates an exception to the general rule that only licensed attorneys may practice law in the state of Washington.[8] The rule authorizes "certain lay persons to select, prepare and complete legal documents incident to the closing of real estate and personal property transactions." To become certified to engage in this limited practice of law such lay persons must first pass an examination. APR 12(b)(2)(ii).[9]
APR 12(d) governs the scope of practice for non-lawyers authorized to provide limited legal services in closing real estate transactions:
Scope of Practice Authorized by Limited Practice Rule: Notwithstanding any provision of any other rule to the contrary, a person certified as a closing officer under this rule may select, prepare and complete documents in a form previously approved by the Board for use in closing a loan, extension of credit, sale or other transfer of real or personal property. Such documents shall be limited to deed, promissory notes, guaranties, deeds of trust, reconveyances, mortgages, satisfactions, security agreements, releases, Uniform Commercial Code documents, assignments, contracts, real estate excise tax affidavits, and bills of sale. Other documents may be from time to time approved by the Board.
(Emphasis added.) Consistent with this provision, APR 12(b)(2)(vii) provides that the Limited Practice Board "shall approve standard forms for use by closing officers in the performance of services authorized by this rule."
APR 12(e) prescribes the circumstances under which certified closing officers may prepare and complete these Board-approved documents:
Certified closing officers may render services authorized by this rule only under the following conditions and with the following limitations:

*808 (1) Agreement of the Parties. Prior to the performance of the services, all parties to the transaction shall have agreed in writing to the basic terms and conditions of the transaction.
(2) Disclosure to the Parties. The closing officer shall advise the parties of the limitations of the services rendered pursuant to this rule and shall further advise them in writing:
(i) that the closing officer is not acting as the advocate or representative of either of the parties;
(ii) that the documents prepared by the closing officer will affect the legal rights of the parties;
(iii) that the parties' interest in the documents may differ;
(iv) that the parties have a right to be represented by lawyers of their own selection; and
(v) that the closing officer cannot give legal advice as to the manner in which the documents affect the parties.
(Emphasis added.) Here, it is undisputed that the LPO advised the parties in writing about the items prescribed in APR 12(e)(2)(i) through (v).
There is substantial factual dispute, however, about whether the LPO also advised the parties of the "limitations of the services rendered" and a legal dispute about the extent of her duty to do so. APR 12(e)(2).

A. STANDARD OF CARE[10]
Jefferson Title concedes that its LPOs practice "law by selecting and preparing approved real estate documents" under APR 12. But it contends that here its LPO merely inserted "lawyer drafted clauses into lawyer drafted real estate forms" and, thus, was not engaged in the unauthorized practice of law. Jefferson Title further argues that: (1) because it served as escrow agent, it owed no duty to provide legal advice to Bishop; and (2) because it provided Bishop with the standard notice that the documents affected legal rights and he had a right to be represented by a lawyer, Jefferson Title did not engage in the unauthorized practice of law. We disagree.

1. LIMITED PRACTICE UNDER APR 12
Jefferson Title's LPO partially complied with APR 12 when she selected and prepared some standard documents for closing real estate transactions. But beyond that, she did not comply. First, she did not confine her selection of documents to those the Board had approved. Second, she did not advise the parties of the limitations of her practice. Third, when she exceeded the authorized scope of limited practice, she was required to meet the same standard of care as a licensed attorney. Bishop has provided substantial evidence to show she did not meet such standard of care, and that evidence is sufficient to preclude summary judgment for Jefferson Title.

a. Use of Unauthorized Forms
Jefferson Title's LPO used "Exhibit B," the so-called "wrap-around" document, in both contested transactions. But Exhibit B was not a form previously approved by the Board.[11] The preparation of "Exhibit B" by Jefferson Title's attorney does not satisfy this strict requirement of APR 12(d) and (b)(2)(vii). The suitability of "Exhibit B" and its comparison with the forms authorized by the Limited Practice Board raise a significant issue of material fact to be resolved at trial.

*809 b. Failure to Advise of Limitations
Jefferson Title contends that: (1) because its LPO complied with APR 12(e)(2)(i)-(v), it fulfilled its duty to the real estate transaction parties, including Bishop; and (2) thereafter, it was incumbent on Bishop to seek independent legal counsel if he so chose. But this argument ignores the conjunctive "and" that precedes the five-part written disclosure requirement of APR 12(e)(2)(i)-(v).
In addition to such five-part written disclosure, the LPO must advise the parties about the limitations of the services rendered under the limited practice rule. APR 12(e)(2). The record here reveals no additional advice about the LPO's limitations beyond the five enumerated in APR 12(e)(2)(i)-(v). Thus, on the record before us, it appears that Jefferson Title failed to fulfill this duty prescribed as a condition of the limited practice of law under the rule. Its LPO exceeded the scope of APR 12 limited practice.

2. BEYOND THE SCOPE OF APR 12 LIMITED PRACTICE
In closing Bishop's real estate transactions, Jefferson Title's LPO engaged in the practice of law by using Exhibit B and filling in blanks. The Supreme Court has held that a mortgage company
engaged in the practice of law by selecting and completing the various documents necessary to process [a] residential home loan. This cannot be seriously disputed. The practice of law includes the selection and completion of legal instruments by which legal rights and obligations are established. It is established that the selection and preparation of promissory notes and deeds of trust is the practice of law.

Perkins v. CTX Mortgage Co., 137 Wash.2d 93, 97, 969 P.2d 93 (1999) (citations omitted). The court further held that "in order to fully safeguard the public interest," lenders must comply with the standard of care of a practicing attorney when preparing legal documents that are ordinarily incident to lenders' financing activities. Perkins, 137 Wash.2d at 106, 969 P.2d 93. Thus, Jefferson Title is held to the same standard of care as a practicing attorney. Perkins, 137 Wash.2d at 93, 969 P.2d 93; Cultum v. Heritage House Realtors, Inc., 103 Wash.2d 623, 694 P.2d 630 (1985); Bowers v. Transamerica Title Ins. Co., 100 Wash.2d 581, 675 P.2d 193 (1983).
Perkins distinguished the practice of law from lay people entering "objective data," which is "unlikely to result in the uncertain legal rights with which this court has been concerned." Perkins, 137 Wash.2d at 106, 969 P.2d 93. But here, unlike the mortgage company in Perkins, Jefferson Title's LPO did more than enter objective data into standard, approved, form documents. Rather, she used unapproved documents that she did not understand, and she used designations and inserted language into documents that significantly affected the parties' obligations, without knowing or understanding the legal impact of the modified deed or attached Exhibit B,[12] contrary to APR 12 (g). Thus, she engaged in the unauthorized practice of law.[13]
*810 B. BREACH OF DUTY
Jefferson Title's LPO failed to advise Bishop that she was using a closing document modified from the approved form allowed under APR 12 and failed to advise the parties of the limitations of such practice, contrary to APR 12(e)(2).[14] APR 12(d) limits the LPO to "documents in a form previously approved by the Board for use in closing a loan, extension of credit, sale or other transfer of real or personal property." (Emphasis added.)
An LPO engages in the unauthorized practice of law and exceeds the grant of authority under APR 12(d) if she uses documents not approved by the Limited Practice Board. Here, the LPO failed in her duty to "advise the parties of the limitations of the services rendered pursuant to this rule." APR 12(e)(2). Thus, Bishop has made out a prima facie case of malpractice.[15]
Our review of the record shows that Bishop raised significant issues of material fact concerning Jefferson Title's actions sufficient to defeat a motion for summary judgment. Specifically, "Exhibit B" improperly subjected Bishop's successors to others' debts, which in turn resulted in monetary damages to Bishop.[16] Thus, grant of summary judgment to Jefferson was reversible error.

III. OTHER CLAIMS

A. BISHOP'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY
Bishop also asks us to "direct judgment for [him] on both issues of liability and remand the case to the Superior Court for jury trial on the issue of damages." Bishop has established a prima facie case of APR 12 malpractice and has alleged sufficient facts to take his case to the jury on the issues of damages and causation.
Liability for legal malpractice requires proof of four elements: (1) the existence of an attorney-client relationship giving rise to a duty of care on the part of the lawyer; (2) an act or omission breaching that duty; (3) damage to the client; and (4) the breach of duty must have been a proximate cause of the damages to the client. Hizey v. Carpenter, 119 Wash.2d 251, 260-61, 830 P.2d 646 (1992).
Nielson v. Eisenhower & Carlson, 100 Wash. App. 584, 589, 999 P.2d 42 (2000). "The measure of damages for legal malpractice is the amount of loss actually sustained as a proximate result of the attorney's conduct." Matson *811 v. Weidenkopf, 101 Wash.App. 472, 484, 3 P.3d 805 (2000) citing Tilly v. Doe, 49 Wash. App. 727, 732, 746 P.2d 323 (1987).
Viewing the evidence and inferences in the light most favorable to Jefferson Title, as we must on Bishop's motion for summary judgment, we cannot say on the record before us that Bishop is entitled, as a matter of law, to judgment on the issue of liability. Taking the evidence in the light most favorable to Jefferson Title, the nonmoving party, there remain questions of material fact concerning whether Jefferson Title's malpractice was the proximate cause of the damage to Bishop. It is still reasonably possible, for example, that Jefferson Title may prove at trial that Bishop is partly responsible for his damages because he failed to consult independent legal counsel and because he failed to protect himself against DeChantal's financial irresponsibility.
Moreover, the record is not clear how Bishop would have acted had Jefferson Title not been engaged in malpractice or the unauthorized practice of law. The record does show that Bishop was deceived by DeChantal who, for example, sent Bishop a document labeled "reconveyance," which lulled Bishop into believing that he had the final paperwork for the property and clear title. The record also shows that Bishop did not understand the nature of the document he signed in connection with the 1994 Hieb Transaction:
Q. You knew at the time that you signed Exhibit 12 and the other document concerning the '94 transaction that if DeChantal didn't fulfill his commitments to the underlying lender, Pacific Coast, that there could be problems, correct?
A. No.
Q. You didn't understand that?
A. No, I didn't understand that. I didn't understand that I would be taking on a $205,000 debt for a $65,000 piece of property.
Clerk's Papers at 452, Bishop Deposition page 63.
In drafting the documents, DeChantal's deception was compounded when Jefferson Title's LPO negligently drafted the property transfer documents between Bishop and Hieb. But this negligence does not make Jefferson Title automatically and solely liable as a matter of law for Bishop's damages; DeChantal may also be liable. Thus, we hold that the trial properly denied Bishop's motion for summary judgment.

B. CONSUMER PROTECTION ACT
Bishop also contends the trial court erred in granting summary judgment to Jefferson Title on his claim for damages under Chapter 19.86 RCW, the Consumer Protection Act (CPA). To sustain an action under the CPA, the plaintiff must show that the defendant's conduct (1) was "unfair or deceptive" (2) was "in the conduct of trade or commerce;" (3) impacted "the public interest;"[17] (4) injured "the plaintiff in his or her business or property;" and (5) was causally linked to the "injury suffered."[18] "[T]he question of whether particular actions gave rise to a violation of the Consumer Protection Act is *812 reviewable as a question of law." Svendsen v. Stock, 143 Wash.2d 546, 553, 23 P.3d 455, 459 (2001), citing Keyes v. Bollinger, 31 Wash. App. 286, 289, 640 P.2d 1077 (1982).
In Bowers, 100 Wash.2d at 581, 675 P.2d 193, the court ruled that (1) the escrow company, Transamerica, negligently engaged in the practice of law; (2) such actions were unfair and deceptive under the CPA; (3) Transamerica was engaged in trade or commerce; and (4) Transamerica's unauthorized practice of law impacted the public interest. Similarly, Bishop's claims meet the CPA criteria. Bishop has alleged sufficient facts to support his claim that Jefferson Title's unauthorized and negligent practice of law caused him financial harm by unfairly causing him, in essence, to pay for the same land twice. Bishop first paid DeChantal for his original land purchase, but DeChantal pocketed the money rather than applying it to pay off the encumbrance on the land. Bishop also assigned a $36,000 note to DeChantal in exchange for the property that Bishop eventually sold to Hieb.
When Bishop sold the land to Heib, the parties did not realize that the LPO-prepared documents, namely Exhibit B, subjected Bishop to paying DeChantal's underlying deed of trust. The LPO allegedly misled both Bishop and Hieb by creating an appearance of competent use of appropriate legal forms, without advising them of the limitations of her practice or that the forms were not approved for use by a LPO. By serving as escrow agent, Jefferson Title was engaged in trade or commerce; such unauthorized practice of law by its LPO impacted not only the parties to the transactions at issue here, but also those members of the public similarly situated. Ultimately, Hieb paid part of DeChantal's debt in order to unencumber his land, and Bishop paid the $67,116.50 judgment to reimburse Hieb. In essence, Bishop paid for the same land twice. Bishop's CPA claim should go to trial.
Accordingly, we hold that the trial court erred in granting summary judgment to Jefferson Title on Bishop's CPA claim.

IV. ATTORNEY FEES

A. JEFFERSON TITLE
The trial court awarded Jefferson Title $26,876.55 in attorney fees "pursuant to written agreement," found in paragraph 9 of the escrow instructions:
Should any disputes arise between parties interested in property or funds covered by these instructions, you shall have the option to hold all matters pending in their then existing status or to join in or commence a court action, deposit the money and documents referred to herein into the Registry of the Court or upon holding this escrow open for determination of the rights of the parties, you will be relieved of all responsibility. It is further agreed that in the event of any suit or claim made against you by either or both parties to this agreement, that said party shall be required to pay you all expenses, costs and reasonable attorneys' fees in connection therewith, whether suit is instituted by you or any of the parties hereto.
Clerk's Papers at 210 (emphasis added). Jefferson Title contends that this provision supports the trial court's award of attorney fees simply because Bishop instigated the litigation. We disagree.
Contract language is a matter of law, which we review de novo. Caroff v. Farmers Ins. Co. of Wash., 98 Wash.App. 565, 568, 989 P.2d 1233 (1999); Litho Color, Inc. v. Pac. Employers Ins. Co., 98 Wash. App. 286, 295, 991 P.2d 638 (1999). Here, paragraph nine cannot be reasonably interpreted to impose Jefferson Title's attorney fees on Bishop when Bishop sues Jefferson Title for malpractice and prevails.
We find instructive Eifler v. Shurgard Capital Mgmt. Corp., 71 Wash.App. 684, 861 P.2d 1071 (1993), in which the court interpreted similar language: The "[t]enant agrees to pay all costs and expenses, including attorneys fees and reasonable service fees, of Landlord in enforcing the terms of this lease." Eifler, 71 Wash.App. at 698, 861 P.2d 1071. The court ruled,
This language might entitle Shurgard to costs and reasonable attorney fees if it were suing Eifler to enforce the lease.

*813 However, it does not entitle Shurgard to costs and attorney fees where Eifler is suing Shurgard to enforce his rights under the common law and the CPA.
Eifler, 71 Wash.App. at 698, 861 P.2d 1071 (footnote omitted).
Similarly here, paragraph 9 of the escrow instructions might entitle Jefferson Title to "expenses, costs and reasonable attorneys' fees" if Bishop were suing to enforce the escrow instructions concerning the property or funds covered by the real estate transaction. But, as in Eifler, Bishop sued Jefferson Title to enforce "rights under the common law and the CPA." Eifler, 71 Wash. App. at 698, 861 P.2d 1071.
Paragraph 9 does not support the trial court's award of attorney fees to Jefferson Title or Jefferson Title's request for attorney fees and expenses on appeal under RAP 18.1. Accordingly, we reverse the trial court's award of attorney fees to Jefferson Title below; and we deny attorney fees to Jefferson Title on appeal.

B. BISHOP
Bishop requests attorney fees on appeal under the Consumer Protection Act, RCW 19.86.090. Bowers discussed the proper calculation of CPA attorney fees, but a majority did not agree on the applicable method. The Bowers court provided the following direction to the trial court on remand:
Our resolution of this issue requires that the trial court reconsider the matter of attorney fees to calculate a lodestar figure which does not include time for duplicated work or other unproductive time. The lodestar thus obtained may be adjusted to reflect the contingent nature of the litigation. No adjustment should be made for the quality of work.
Bowers, 100 Wash.2d at 601, 675 P.2d 193. Similarly here, if Bishop prevails on his CPA claim after trial on remand, then the trial court should calculate attorney fees owing to Bishop both at trial and for this appeal.

V. MOTION TO STRIKE WOLFLEY'S AFFIDAVIT
Jefferson Title moved to strike the affidavit of Lane J. Wolfley, who serves as Bishop's counsel. The trial court did not mention the motion to strike in its Findings of Fact and Conclusions of Law. Although Jefferson Title did not cross appeal the trial court's failure to rule on its motion, Jefferson Title now ask us to strike the affidavit on appeal. A party may include in an appellate brief "only a motion which, if granted, would preclude hearing the case on the merits." RAP 17.4(d). Jefferson Title's motion does not meet this requirement. Even were we to grant the motion and strike the Wolfley affidavit, Jefferson Title does not show how such action would preclude the trial court from hearing this case on the merits. Therefore, we deny the motion to strike.

CONCLUSION
We affirm the trial court's denial of Bishop's motion for summary judgment on the issue of liability. We reverse summary judgment for Jefferson Title on Bishop's claims of malpractice and CPA violations, and we remand for trial on the issues of liability and damages.
We reverse the trial court's award of attorney fees to Jefferson Title below and deny Jefferson Title attorney fees on appeal. The trial court may award trial and appellate attorney fees to Bishop under the Consumer Protection Act, RCW 19.86.090, if Bishop ultimately prevails on his CPA claim.
We concur: ARMSTRONG, C.J., and QUINN-BRINTNALL, J.
NOTES
[1] The 1991 statutory warranty deed from DeChantal conveyed two parcels, Parcels II and VI, to Bishop. (Roman Numerals used herein since parcels have different or duplicative designations in different transactions.) These parcels were designated as parcels "A" and "B" in exhibit "A" to the warranty deed.
[2] The deed of trust in the record does not contain the full legal description of the properties involved in the Bishop-to-DeChantal deed of trust. Throughout the record there is a missing page in the Bishop-to-DeChantal deed of trust, which should describe Parcel B (parcel VI), along with the appurtenant easement parcels. The legal descriptions in the Bishop-to-DeChantal transaction do not match up with the property descriptions in the DeChantal-to-Bishop transaction.
[3] "Exhibit B" was prefaced with the writing "TO FURTHER PROTECT THE SECURITY HEREOF, Beneficiary and Grantor agree as follows[.]"
[4] Bishop testified that he exchanged a $36,000 note for a quit claim deed to 20 acres of property within DeChantal's development.
[5] The 1994 statutory warranty deed from Bishop to Hieb apparently involved six parcels, Parcels II and VI (designated in the deed as parcels "D" and "E" respectively), as well as Parcels III, VII and VIII (designated in the deed as parcels "A," "C" and "B" respectively). Bishop's brief mentions "6 lots totaling 15 acres." Based on the record, five parcels (Parcels II, III, VI, VII, VIII) appear to comprise 27.36 acres.
[6] The 1994 Exhibit B also refers to the "beneficiary's" first note on the deed of trust to Pacific Coast.
[7] The foreclosure also included two parcels not involved in this case, parcels IV and V; it did not include parcel III, a five-acre parcel that Bishop deeded to Hieb in 1994.
[8] A lawyer shall not: "[a]ssist a person who is not a member of the Bar in the performance of activity that constitutes the unauthorized practice of law." RPC 5.5(b). It is the duty of the court "to protect the public from the activity of those who, because of lack of professional skills, may cause injury whether they are members of the bar or persons never qualified for or admitted to the bar." Bennion, Van Camp, Hagen & Ruhl v. Kassler Escrow, Inc., 96 Wash.2d 443, 447, 635 P.2d 730, (1981), citing Washington State Bar Ass'n v. Great W. Union Fed. Sav. & Loan Ass'n, 91 Wash.2d 48, 60, 586 P.2d 870 (1978). RCW 2.48.180 provides criminal penalties for the practice of law without bar membership: "Unlawful practice of law is a crime. A single violation of this section is a gross misdemeanor."
[9] The rule also requires LPOs to complete minimum continuing education. APR 12(f).
[10] We review de novo legal issues concerning standard of care and the existence of a duty. See, e.g., Branom v. State, 94 Wash.App. 964, 968, 974 P.2d 335, review denied, 138 Wash.2d 1023, 989 P.2d 1136 (1999).
[11] Among the forms authorized by the Limited Practice Board are: (1) LPB No. 35 "Subordination Agreement;" (2) LPB No. 60 "Release of Lien;" and (3) LPB No. 61 "Partial Release of Lien." WASHINGTON PRACTICE Vol. 1C, § 86.26. The record does not indicate whether the LPB-approved form "Subordination Agreement" would have sufficed for the transactions among DeChantal, Bishop, and Hieb. The affidavit of Jefferson Title's expert, Jane Stafford, a practicing LPO and member of the Limited Practice Board, states that "Exhibit B" does not violate APR 12; but she fails to state whether the language of "Exhibit B" is the subordination form approved for LPOs by the Limited Practice Board.
[12] Jefferson Title's LPO Lockhart testified about her understanding of what language to include in documents involving underlying encumbrances:

Q.... The underlying mortgage was encumbered not only the property that was being sold, ... and, also, was of a value much larger than the value of the ... parcel being sold. Was it your understanding that it was appropriate to use this type of language in that situation?
A. I don't have any other language in that situation to use but that so that would be the one to use.
Q. Did you explain to either of the parties the possible pitfalls or difficulties that could occur by failing to obtain the Deed release from the underlying....
A. I ...
Q. .... Original?
A. .... don'tI don't recall.
....
Q. And is it your impression, also, that aa wrap transaction is appropriate when the underlying encumbrance, in this case a Deed of Trust, is an obligation much larger than the value of the land being sold and extends to other properties as well?
A. Yes.
Report of Proceedings at 10 and 20, respectively.
[13] The limited practice rule "in no way" expands, narrows, or affects "existing law in the following areas:"

(4) The lack of authority of a certified closing officer to give legal advice without being licensed to practice law;
(5) The standard of care which a certified closing officer must practice when carrying out the functions permitted by this rule.
APR 12 (g). The existing law before and after promulgation of APR 12 is that the standard of care for a non-attorney closing a real estate transaction is that of a practicing attorney. APR 12 initially promulgated in 1983, did not change this standard. Bowers, 100 Wash.2d at 587, 675 P.2d 193 (1983) (decided on facts arising in 1979) and Perkins, 137 Wash.2d at 97, 969 P.2d 93 (1999) both apply the same standard.
[14] Amicus Washington State Bar Association argues that

The LPO also had to advise the parties that the services she rendered were limited in at least two ways. First, the LPO had to advise the parties that she was not authorized to close using the modified documents because they were not in a form approved by the Board.... Second, the LPO had to advise the parties that she could not close at all unless they either obtained independent counsel regarding the legal effect of the modifications, or agreed to close with the attorney who drafted the unapproved, nonstandard modification and addendum.
Brief of WSBA at 10.
[15] Accordingly, we need not reach Bishop's argument that the "wrap-around" deed of trust used by Jefferson Title in the 1991 DeChantal/Bishop transaction, without a deed of partial reconveyance, is not legally appropriate for the transaction as a matter of law.
[16] As Bishop points out, "The Statutory Warranty Deed of May 6, 1994, between the Bishops and Hieb required the Bishops to pay the underlying debt owed by DeChantal on the entire land development!"

Moreover, the record shows a clerical error in the 1994 deed from Bishop to Hieb, which incorrectly states that the 1990 deed of trust from DeChantal to Pacific Coast was recorded April 20, 1990. The correct date of recording for the DeChantal to Pacific Loan deed of trust is April, 30, 1990. And the language in the 1994 statutory warranty deed improperly mixes up the grantors and grantees. Bishop is the grantor, and Hieb is the grantee, yet the "subject to" language fails to consider that DeChantal, and not Bishop, is the grantor in the underlying 1990 deed of trust.
[17] The criteria for determining public interest are as follows:

[W]hether the public has an interest in any given action is to be determined by the trier of fact from several factors, depending upon the context in which the alleged acts were committed....
Where the transaction was essentially a private dispute (see, e.g., ... Bowers v. Transamerica Title Ins. Co., 100 Wash.2d 581, 675 P.2d 193 (1983) (escrow closing agentclient)), it may be more difficult to show that the public has an interest in the subject matter.... Factors indicating public interest in this context include: (1) Were the alleged acts committed in the course of defendant's business? (2) Did defendant advertise to the public in general? (3) Did defendant actively solicit this particular plaintiff, indicating potential solicitation of others? (4) Did plaintiff and defendant occupy unequal bargaining positions? As with the factors applied to essentially consumer transactions, not one of these factors is dispositive, nor is it necessary that all be present. The factors in both the "consumer" and "private dispute" contexts represent indicia of an effect on public interest from which a trier of fact could reasonably find public interest impact.
Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wash.2d 778, 789-91, 719 P.2d 531 (1986). See also, Anhold v. Daniels, 94 Wash.2d 40, 45, 614 P.2d 184 (1980).
[18] Hangman Ridge, 105 Wash.2d at 784-85, 719 P.2d 531.